RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0281p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

GENESIS HILL,

      *Petitioner-Appellee/Cross-Appellant,*

      *v.*

BETTY MITCHELL, Warden,

      *Respondent-Appellant/Cross-Appellee.*

Nos. 13-3412/3492

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:98-cv-00452—Edmund A. Sargus, Jr., Chief District Judge.

Argued: January 27, 2016

Decided and Filed: December 1, 2016

Before: COLE, Chief Judge; BATCHELDER and McKEAGUE, Circuit Judges.
_____

**COUNSEL**

**ARGUED:** Jocelyn S. Kelly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Justin C. Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Jocelyn S. Kelly, David M. Henry, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Justin C. Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, Lawrence Bradfield Hughes, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellee/Cross-Appellant. John A. Freedman, ARNOLD & PORTER LLP, Washington, D.C., for Amicus Curiae.

    McKEAGUE, J., delivered the lead opinion in which BATCHELDER, J., joined in all but § III.D. BATCHELDER, J. (pp. 48–50), delivered a separate concurring opinion. COLE, C.J. (pp. 51–62), delivered a separate dissenting opinion.

---

**OPINION**

---

McKEAGUE, Circuit Judge.  An Ohio jury convicted Genesis Hill of kidnapping and murdering his infant daughter and sentenced him to death.  The district court held that the prosecution violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing favorable evidence—a police report and the baby's mother's grand jury testimony—and granted a conditional writ of habeas corpus.  However, Hill violated a congressionally mandated procedural requisite to habeas relief by bringing his *Brady* claim well beyond AEDPA's one-year statute of limitations period.  Because Hill's *Brady* claim is procedurally barred and is otherwise without merit, and because his other grounds for relief are also without merit, we reverse the grant of habeas relief.

**I**

*Factual Background.*  The Ohio Supreme Court provided a detailed background of the events leading to Hill's conviction and sentence:

> On May 31, 1991, defendant-appellant, Genesis Hill, crept into his girlfriend's apartment in Cincinnati and surreptitiously removed their six-month-old daughter, Domika Dudley.  On June 2, police found Domika's body, wrapped in trash bags, in a vacant lot behind Hill's house.

> Hill, age nineteen, and Teresa Dudley, age eighteen, lived near each other and had an on-going relationship.  Their daughter, Domika Dudley, was born in November 1990.  Around May 29, 1991, Barbara Janson, a neighbor, heard Teresa "making silly little comments" to Hill that she was going to take him to court for child support.  Hill replied that "he'd kill that little bitch before he paid anything."  Teresa recalled Hill saying," I bet I don't pay," when she asked him about child support.

> On May 31, in the late afternoon, Hill and Teresa were together in Hill's yard.  Teresa became upset, they argued, and Teresa went home.  That evening, Teresa went to sleep in her mother's second-floor apartment in the same room as Domika.  Between 11:00 p.m. and midnight, Janson and another neighbor saw Hill enter the front yard of Teresa's apartment building, but they did not see Hill leave.  That front entrance was the only entry way to her apartment except for the back yard, which was enclosed by a high wall.  Ten to fifteen minutes after the neighbors saw Hill, Teresa came out and said Domika was missing.

Teresa went to Hill's home, but was told that Hill was not there and did not have the baby. Hill lived in the same building as did his uncle and two aunts. Just then, Hill appeared, but he denied knowing where his daughter was. A neighborhood search for Domika by police proved unsuccessful. Hill appeared unconcerned, did not participate in the search, and was "snickering" and "grinning" as Teresa talked to police about their missing baby.

Around 5:45 a.m., June 1, Teresa and one of Hill's aunts found a distinctive blue and pink barrette on the floor of Hill's garage. That barrette was identical to one used in Domika's hair before she went to sleep.

On the afternoon of June 2, police found a suspicious SMA® baby formula carton in an overgrown vacant lot behind Hill's garage. That box was not there on the day before when police searched the lot. Domika's body was inside the carton. A plastic shopping bag and three plastic trash bags had been successively wrapped around her body. Black electrical tape was wrapped around the outer trash bag.

A man's blue shirt, with white and red stripes, was tied around Domika's head. Teresa and Janson identified this shirt as one that "looks like" a shirt Hill owned.

Domika died as a result of three skull fractures, and she had been dead for more than twelve hours. Either a strong, blunt force had struck her head, or her head had been crushed. She might have been injured in a fall, but it seems only if another force had hit her during or after the fall. She was wearing only a diaper and two barrettes.

The baby formula box, in which Domika was found, was similar to one that Hill's aunt had placed in the trash pile next to Hill's garage. The box was in the trash on June 1, but not on June 2. Batch numbers on an SMA® can from the aunt's pantry matched batch numbers on the box in which Domika was found. Hill's uncle was unable to find the black electrical tape that he kept in a tool box.

A forensic expert testified that the last trash bag wrapped around Domika had once been directly attached to a trash bag found in Hill's kitchen. Microscopic grain, crease, and other distinctive marks made in the manufacturing process matched exactly on the two trash bags.

At Teresa's apartment, police found Hill's right thumb print on a hallway light bulb near where Teresa and Domika had slept. When Teresa went to sleep that night, the hallway door had been partly open and the light had been on. When she awoke and discovered Domika missing, the light bulb was unscrewed.

On the evening of June 2, the day Domika's body was found, a Cincinnati bus driver overheard a conversation on his bus. One young man, crying and upset, told another, "he could not believe what he had done to a little baby." The man further stated, "he thought he might get the chair for it." After the bus driver heard the news about a dead baby, police were called. The bus driver picked Hill out of a photo array as the young man crying on the bus.

A grand jury indicted Hill on two felony-murder counts in violation of [Ohio Revised Code] 2903.01: murder during an aggravated burglary (Count I) and during a kidnapping (Count II). Each aggravated murder count contained two death-penalty specifications under R.C. 2929.04(A)(7) (murder during an aggravated burglary and murder during a kidnapping). Count III charged aggravated burglary in violation of R.C. 2911.11, and Count IV charged kidnapping in violation of R.C. 2905.01. Hill pled not guilty.

At trial, numerous friends and relatives testified for Hill and described his activities on the evening of May 31. Defense witnesses suggested that only two trash bags had been in the kitchen; that Teresa was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill's kitchen; and that she may have "planted" the barrette on the garage floor.

Hill testified as to his activities on May 31. He admitted he had been in the hallway, outside Teresa's door, around 11:00 p.m., and had unscrewed the light bulb. He claimed he only "whistled" to Teresa. When she did not answer, he left and went out the front, the same way he came in. He said he then "[w]ent on about [his] business" (drinking with friends). In his narrative testimony, Hill implicitly denied taking Domika, but he did not explicitly do so. Cross-examination revealed discrepancies between his testimony and his statements to police and two mental health professionals.

The jury found Hill guilty as charged.

*State v. Hill*, 661 N.E.2d 1068, 1072–74 (Ohio 1996).

During the penalty phase, numerous relatives and friends testified regarding Hill's character and upbringing and Dr. Nancy Schmidtgoessling testified regarding Hill's mental health and background. Hill also submitted an unsworn statement, where he said, "I feel hurt. Growing up was hard. A lot of things wasn't right for me," and he "struggled to survive." *Id.* at 1074. He was "sorry that you all have to be here," "sorry that the baby [was] gone, and "sorry for the family." *Id.* He did not admit or deny killing Domika. After hearing the evidence, the jury recommended the death penalty.

*Procedural Background.* The Ohio Court of Appeals and the Ohio Supreme Court affirmed Hill's convictions and sentence. *State v. Hill*, Nos. C-910916, C-940487, 1994 WL 721580, at *15 (Ohio Ct. App. Dec. 21, 1994), *aff'd*, 661 N.E.2d 1068, 1085 (Ohio 1996), *cert. denied*, 519 U.S. 895 (1996). Hill sought post-conviction relief in state court on various grounds, including alleged unrelated *Brady* violations, but was unsuccessful. *State v. Hill*, No. C-100554, 2011 WL 3477183, at *7–8 (Ohio Ct. App. Aug. 10, 2011), *perm. app. denied*, 974 N.E.2d 112

(table decision) (third petition); R. 263, Ohio Ct. App. Decision, Page ID 6849, *perm. app. denied*, 808 N.E.2d 398 (Ohio 2004) (table decision) (second petition); *State v. Hill*, 740 N.E.2d 282, 283 (Ohio 2001) (denying motion to reopen petition for post-conviction relief); *State v. Hill*, No. C-961052, 1997 WL 727587, at *2 (Ohio Ct. App. Nov. 21, 1997), *perm. app. denied*, 690 N.E.2d 1288 (Ohio 1998) (table decision) (first petition).

Hill filed a habeas petition in the district court in June 1998 raising numerous grounds for relief, including a *Brady* claim alleging that the State suppressed favorable evidence. He filed an amended petition in April 1999, raising a *Brady* claim alleging that the prosecution "failed to disclose . . . exculpatory evidence in its possession which, if disclosed, would have been material to the outcome of [Hill's] trial." App. R. 42, Am. Habeas Petition at ¶ 87, J.A. Vol. 2 at 396. Hill then filed a second amended petition in December 2005. R. 137-1, Second Am. Habeas Petition, Page ID 85–103. In that petition, Hill asserted a three-part *Brady* claim as his fourth ground for relief. *Id.* at 27–32, ¶¶ 77–97, Page ID 111–16. The district court dismissed the first two parts of Hill's *Brady* claim on the merits. In sub-part (c) (referred to as (Claim 4(c)), Hill made only the sweeping assertion that "[t]he State likely has still more *Brady* material that it is refusing or unable to produce." R. 137-1, Second Am. Habeas Petition at 31, Page ID 115. Hill did not identify any *Brady* evidence to support Claim 4(c), leading the district court to dismiss it because "the utter lack of substance to the claim makes any procedural default analysis not only impossible, but also unnecessary." *Hill v. Mitchell*, No. 1:98-CV-452, 2006 WL 2807017, at *63 (S.D. Ohio Sept. 27, 2006).

In December 2007, Hill discovered a suppressed police report from the night Domika went missing. R. 219-3, Jim Silvania Decl., Page ID 2296–97 (averring that Silvania obtained report on December 17, 2007 and sent it to Hill's counsel via overnight mail on December 18, 2007). In March 2011, he moved the district court to reconsider its finding that Claim 4(c) was procedurally defaulted and to find that the report established cause and prejudice to excuse the procedural bar. The district court agreed and granted the motion for reconsideration. *Hill v. Mitchell*, No. 1:98-cv-452, 2012 WL 995280, at *14 (S.D. Ohio Mar. 23, 2012).

In September 2012, Hill moved the district court to expand the record to include a transcript of Teresa Dudley's grand jury testimony, also in support of Claim 4(c). R. 237,

Motion to Expand at 7–8, Page ID 2573–74. It appears that the State disclosed the testimony in October 2010. *Id.* at 4, Page ID 2570.

In March 2013, the district court granted habeas relief on Claim 4(c) based on suppression of the police report. *Hill v. Mitchell*, No. 1:98-cv-452, 2013 WL 1345831 (S.D. Ohio Mar. 29, 2013). The court also granted Hill's motion to expand the record to include Dudley's grand jury testimony as further *Brady* evidence in support of Claim 4(c). The district court denied Hill's remaining grounds for relief and issued a conditional writ of habeas corpus directing the State to either release Hill or grant him a new trial. The State timely appealed on the *Brady* claim, and Hill cross-appealed on five issues: sufficiency of the evidence, ineffective assistance of trial counsel at the penalty phase, ineffective assistance of counsel on direct appeal, the constitutionality of Ohio's system of proportionality review, and cumulative error.

**II**

We review the district court's decision to grant a petition for a writ of habeas corpus *de novo*. *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000). Our review of state court decisions is normally governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). Under AEDPA, we review a state-court merits adjudication only to determine whether it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." *Id.* To prevail, a habeas petitioner must "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

AEDPA's deferential standard applies only to claims that have been "adjudicated on the merits in State court proceedings." *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). If the state courts have not addressed a claim on its merits, "federal habeas review is not subject to the deferential standard that applies under AEDPA." *Cone v. Bell*, 556 U.S. 449, 472 (2009). "Instead, the claim is reviewed *de novo*." *Id.* (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). Regardless of the standard of review,

however, we may not review claims *at all* unless the petitioner satisfies AEDPA's procedural requirements—including the requirement that a petitioner bring his claims within AEDPA's one-year statute of limitations period.

**III**

The district court granted habeas relief on Claim 4(c) for violations of *Brady*, 373 U.S. 83. The State argues that the district court erred because (1) Hill did not bring his *Brady* claim within AEDPA's one-year statute of limitations period; (2) the claim was procedurally defaulted; and (3) the claim fails on the merits. For the reasons that follow, we agree that Hill's claim is barred by AEDPA's statute of limitations.

**A. Background**

Hill first raised Claim 4(c) in his second amended habeas petition in October 2005. R. 137-1, Second Am. Habeas Petition at 31, Page ID 115. Claim 4(c), in its original form, did not cite any specific *Brady* material, making only the sweeping assertion that "[t]he State likely has still more *Brady* material that it is refusing or unable to produce." *Id.* Hill based this vague allegation on other cases in which the Hamilton County Prosecutor's Office was found to have violated *Brady*. *Id.* Hill also asserted that he asked to review the prosecutor's and investigating officers' files, but was not allowed to do so. *Id.* at 32, Page ID 116. On September 27, 2006, the district court dismissed the original Claim 4(c) as procedurally defaulted because "the utter lack of substance . . . makes any procedural default analysis not only impossible, but also unnecessary." *Hill v. Mitchell*, 2006 WL 2807017, at *63. Hill ultimately discovered *Brady* evidence, but did not assert his amended *Brady* claim in a timely fashion.

*Police Report.* In December 2007, Hill obtained Officer James Givens' police report through a private investigator's public record request. R. 219-4, Police Rep., Page ID 2298–99. Givens was the first officer on the scene after Teresa Dudley called to report Domika missing. In the report, Givens wrote, "Investigate why the mother ran from police and asked for the police to check the alley behind the house (several times)." R. 219-4, Police Rep. at 1, Page ID 2298. Despite his current argument that this report is a smoking gun entitling him to relief, Hill waited *over three years* to bring the report to the district court's attention. In March 2011, Hill moved

the court to reconsider its finding that Claim 4(c) was procedurally defaulted, citing the police report as the *Brady* evidence that was missing from the original catch-all version of Claim 4(c). R. 219, Am. Motion for Reconsideration at 21–28, Page ID 2280–87. The district court was "displeased by [Hill]'s waiting three years to file the instant motion" and found "his reasons explaining the delay wholly wanting." *Hill v. Mitchell*, 2012 WL 995280, at *14. The court explained that, "[u]nder most circumstances, that delay would present an insurmountable (and self-imposed) hurdle to a request for reconsideration." *Id.*

Nevertheless, the district court found "that equitable principles [do not] require or justify a refusal to consider [Hill]'s request because the new evidence at issue strikes at the heart of a case that landed [Hill] on death row." *Id.* To avoid AEDPA's one-year limitation period, the court treated Hill's motion as one to reconsider under Fed. R. Civ. P. 60(b)(2) and granted it. *Id.* at *3. The court found that even if it alternatively considered Hill's motion as one to amend his habeas petition under Fed. R. Civ. P. 15, Hill could still avoid AEDPA's statute of limitations because his motion related back to the original Claim 4(c). *Id.* at*10. The district court then granted habeas relief on the basis of the police report. *Hill v. Mitchell*, 2013 WL 1345831, at *11.

*Grand Jury Testimony.* In October 2010—before moving the district court to reconsider its ruling that Claim 4(c) was procedurally defaulted—Hill obtained a transcript of Teresa Dudley's grand jury testimony. R. 237, Motion to Expand at 4, Page ID 2570. For unexplained reasons, Hill did not include the grand jury testimony in his motion to reconsider Claim 4(c). Instead, he waited another eighteen months, until September 2012, to move the district court to expand the record to include the grand jury testimony. *Id.* The State did not object, and the district court granted the motion. *Hill v. Mitchell*, 2013 WL 1345831, at *13. While the court granted habeas relief on the basis of the police report, it noted that the grand jury testimony "bolster[ed]" its conclusion that Hill was entitled to relief. *Id.* at *13.

**B. Motion for Reconsideration—Fed. R. Civ. P. 60(b)(2)**

The district court granted Hill's motion as one for reconsideration under Fed. R. Civ. P. 60(b)(2). We review that decision for abuse of discretion. *Landrum v. Anderson*, 813 F.3d 330,

334 (6th Cir. 2016) (citing *Tyler v. Anderson*, 749 F.3d 499, 509 (6th Cir. 2014); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006)).  The district court "'necessarily abuse[s] its discretion if it based its ruling on an erroneous view of the law.'"  *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)); *see Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997).

Rule 60(b) allows a habeas petitioner to move the district court to reconsider a judgment or order "under a limited set of circumstances." *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). These limited circumstances include "newly discovered evidence," such as the police report or the grand jury testimony, under Rule 60(b)(2).  *Id.*  But the Supreme Court has consistently explained that the Federal Rules of Civil Procedure apply in habeas cases only "to the extent that they are not inconsistent with any statutory provisions or [the habeas] rules." *Mayle v. Felix*, 545 U.S. 644, 654 (2005) (quoting Habeas Rule 12); *see also Gonzalez*, 545 U.S. at 531–32. Because using Rule 60(b)(2) here would directly contravene AEDPA's one-year statute of limitations, the district court's decision is "inconsistent with [a] statutory provision" and the court abused its discretion in granting the motion. *Mayle*, 545 U.S. at 654.

The district court's approach is also inconsistent Rule 60(b)'s own internal restrictions that "limit the friction" with AEDPA.  Specifically, Rule 60(b) includes a "1-year deadline for asserting three of the most open-ended grounds of relief (excusable neglect, *newly discovered evidence*, and fraud)."  *Gonzalez*, 545 U.S. at 534–35 (citing Fed. R. Civ. P. 60(b)(1)–(3)) (emphasis added).  If Hill's motion was indeed a Rule 60(b)(2) motion based on "newly discovered evidence," then regardless of AEDPA, Hill was required to make the motion "*no more than a year*" after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1) (emphasis added).  But Hill made his motion *more than three years* after he discovered the police report, and more than four years after the district court's order dismissing Claim 4(c).  By characterizing Hill's motion as one for reconsideration, the district court not only improperly circumvented AEDPA's time-bar, but also misapplied the very rule used to evade it. Because the district court's decision was a misapplication of the law, we hold that the court abused its discretion in granting Hill's motion as a motion to reconsider under Rule 60(b)(2).

**C. Motion to Amend—Fed. R. Civ. P. 15**

Because Hill cannot use Rule 60(b) to avoid AEDPA's statute of limitations, he can only prevail if we characterize his motion as one to amend his initial habeas petition under Fed. R. Civ. P. 15. The district court alluded to this alternative, holding that Hill's motion, even if viewed as a motion to amend, was not time-barred because it relates back to the first catch-all iteration of Claim 4(c). *Hill v. Mitchell*, 2012 WL 995280, at *10–14. We again review for abuse of discretion. *Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998).

AEDPA imposes a one-year limitation period on habeas applications under 28 U.S.C. § 2244(d). Fed. R. Civ. P. 15(c)(1) creates an exception: "when a prisoner files an original petition within the one-year deadline, and later presents new claims in an amended petition filed after the deadline passes, the new claims relate back to the date of the original petition if the new claims share a 'common core of operative facts' with the original petition." *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011) (quoting *Mayle*, 545 U.S. at 650); *see* 28 U.S.C. § 2242 (providing that habeas applications "may be amended . . . as provided in the rules of procedure applicable to civil actions"). Rule 15(c)(1) provides that an amendment relates back when it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" If a petition raises a new claim that does *not* relate back, however, AEDPA's statute of limitations bars consideration of the new claim. *Mayle*, 545 U.S. at 656–57.

The contours of the relation-back doctrine have not been fully developed. In *Mayle*, the Supreme Court rejected the proposition that an amended petition asserting new habeas claims relates back simply because the new claims arise from the same "trial, conviction, or sentence" as the original petition. *Id.* at 663–64. The Court noted that "the key words [in Rule 15(c)(1)] are 'conduct, transaction, or occurrence,'" and that the rule "relaxes, but does not obliterate, the statute of limitations." *Id.* at 656, 659 (citing Rule 15(c)). It then explained that "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Id.* at 659. The Court concluded that applying relation back for any trial, conviction, or sentence was too broad a rule, as it would allow "virtually any new claim introduced in an amended petition [to] relate back[] for federal habeas claims." *Id.* at 657.

Instead, the court held that "[a]n amended habeas petition does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those in the original pleading." *Id.* at 650, 663 (rejecting an "unconstrained reading" of Rule 15(c)(1)).[1]

The Court also explained that an overly broad relation-back doctrine would contravene Congress's intent in enacting AEDPA "to advance the finality of criminal convictions." *Id.* at 661 (citing *Rhines v. Weber*, 544 U.S. 269, 276 (2005)). That is, Congress intentionally "adopted a tight time line, a one-year limitation period," and "[i]f claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance." *Id.* at 662. From *Mayle*, then, we know that relation back in those circumstances is not appropriate.

*Mayle* provided additional guideposts for applying the relation-back doctrine, citing two decisions from our sister circuits as examples of proper applications of the relation-back doctrine. *Id.* at 664 n.7 (citing *Mandacina v. United States*, 329 F.3d 995, 1000–01 (8th Cir. 2003); *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001)). In *Mandacina*, the original habeas petition raised a *Brady* claim alleging that the government failed to disclose exculpatory evidence that would have supported the theory that someone other than the petitioner murdered the victim. 328 F.3d at 1001. Specifically, the original claim alleged:

> [T]he Government failed to properly disclose . . . any and all information related by Mr. Strada prior to his death in which Mr. Strada implicated any other person in any criminal activity, including any organized crime-related activity. Such information constitutes favorable and exculpatory information in that it established a motive for others besides Movant Mandacina to have killed or conspired to kill Mr. Strada . . . [T]here is a strong factual basis to support a defense theory . . . that Mr. Strada was killed not because of any statements he may have made regarding Movant Mandacina, but instead was killed by others who had a much stronger motive to retaliate against Mr. Strada.

*Id.* at 1000. Mandacina's original *Brady* claim was thus quite specific, in terms of the information alleged to have been suppressed and its materiality to the defense. The original

---

[1]Although the *Mayle* Court referred to Rule 15(c)(2), the relevant language is now contained in Rule 15(c)(1).

claim did not mention the "Borland Report" by name, but the Eighth Circuit recognized the report of detectives' interview of Donna Borland, which *had* been disclosed to defense counsel, as the "strong factual basis" for the defense theory alluded to in the claim. *Id.* at 998. And while the original *Brady* claim was based on suppression of "any and all information" relating to criminal activity and persons implicated by Strada who may have had a motive to kill him, the amended *Brady* claim alleged that the prosecution had failed "to disclose the names of all suspects with strong motives to murder Strada, as well as all facts developed in the investigation of these suspects." *Id.* at 1001. In other words, the amended *Brady* claim was a slightly *more* specific iteration of the original *Brady* claim, premised more specifically on the suppression of *names* of suspects identified by Borland. And because the amended claim was deemed to "have arisen out of the same set of facts as the original claim[ ]," it was properly deemed to relate back. *Id.* at 1000 (citing *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999)).[2]

Similarly, in *Woodward*, the Tenth Circuit "upheld relation back where the original petition challenged the trial court's admission of recanted statements" and "the amended petition challenged the court's refusal to allow the defendant to show that the statements had been recanted." *Mayle*, 545 U.S. at 664 n.7 (citing *Woodward*, 263 F.3d at 1142). The amended claim was thus deemed to relate back because, in the language of Rule 15(c), it clarified or amplified a claim alleged in the original petition. That is, the amended claim, pertaining to and amplifying the trial court's error in admitting the same recanted statements, arose out of the same set of operative facts as the original claim.

Since *Mayle*, we have allowed relation back in similar circumstances, such as when a motion to amend under Rule 15(c) expands on the facts supporting a claim in the original petition. *See Cowan*, 645 F.3d at 819. In *Cowan*, the original petition alleged a claim for

---

[2]The dissent's characterization of *Mandacina* is markedly different, but erroneous. The dissent accurately quotes language from the opinion describing Mandacina's original petition as containing "*only generalized assertions* that evidence obtained by the Gladstone Police Department was withheld." Dissent at 11 (quoting *Mandacina*, 328 F.3d at 1000) (emphasis added in dissent). But this language represents the district court's rationale for denying relation back—a ruling the Eighth Circuit reversed precisely because this description of Mandacina's original claim was not accurate. The Eighth Circuit recognized that Mandacina's original claim was actually sufficiently specific, as explained above, to both give the government notice and enable the court to determine that the amended claim arose out of the same set of facts as the original. The same cannot be said of Hill's original *Brady* claim.

ineffective assistance of counsel because counsel failed to interview witnesses to support the petitioner's defense that she was not present during the drug transaction that led to her conviction. *Id.* The motion to amend expanded on that claim, "describ[ing] the witnesses whom [trial counsel] could have interviewed, and how [they] could have shown" that the petitioner was not present. *Id.* We held that the amendment related back because "[t]he facts recited in the two documents differed not in kind, but in specificity." *Id.*

Hill's case, however, is markedly different from *Cowan, Mandacina,* and *Woodward.* Hill's motion to amend deals with a *Brady* claim, just like the original Claim 4(c), but the original Claim 4(c) was completely bereft of specific fact allegations or evidentiary support and was not tied to any particular theory of relief. Although Hill asserted grounds for suspicion that a *Brady* violation may have occurred—the Hamilton County Prosecutor's Office's history of *Brady* violations—his original Claim 4(c) merely speculated that the State had *Brady* material, nothing more. The original claim did not identify, even in general terms, the nature of any suppressed information believed to be exculpatory or impeaching or how such suppressed information was material to the defense. A claim that the State was suppressing an unspecified *something* is much different from a claim regarding *what*, specifically, the State was suppressing and how it would have benefitted Hill at trial had it been disclosed.

The "utter lack of substance" in Hill's original *Brady* claim, as the district court put it, separates this case from *Cowan* and the examples cited in *Mayle. Hill v. Mitchell*, 2006 WL 2807017, at *63. In each of those cases, the original claim presented an actual theory for relief, and the amendments only "set forth certain particulars of that claim." *Cowan*, 645 F.3d at 819; *see also Mandacina*, 328 F.3d at 1001; *Woodward*, 263 F.3d at 1142 ("This amendment simply 'clarifies or amplifies a claim or theory in the original' petition[.]"). Hill's original Claim 4(c), by contrast, did not even *raise* a potential claim for relief. Even though Hill asserted that the prosecution was suppressing evidence, the basis for a *Brady* claim is *the evidence that was being suppressed*—not a suspicion that *something* was being suppressed. Hill did not refer to a single piece of *Brady* evidence in the original, catch-all version of Claim 4(c). His amended *Brady* claim cannot be deemed to share a "common core of operative facts" with the original Claim

4(c), as required for relation back, because the original Claim 4(c) alleged no operative facts out of which the amended claim could also be deemed to have arisen. *Mayle*, 545 U.S. at 650.

Applying the relation-back doctrine to such a broad, unsupported claim would also create a greater problem: if a catch-all *Brady* claim, devoid of *Brady* material or specific factual allegations, were sufficient to justify relation back under Rule 15(c), then habeas petitioners could routinely circumvent AEDPA's statute of limitations on *Brady* claims. All a petitioner would need to do is include a catch-all *Brady* claim in his original petition (with no *Brady* evidence) and hope that evidence eventually turns up. If evidence did turn up, the petitioner could then file an amended petition at any time, because any subsequent amendment would relate back and skirt AEDPA's statute of limitations. It would not matter if Hill, or a future petitioner, waited five, ten, or even twenty years to present *Brady* evidence, even after its discovery. Such a result would eviscerate AEDPA's statute of limitations for *Brady* claims and would run directly contrary to Congress's intent.

We understand the rationale behind the district court's decision, which was largely based on equitable principles and the fact that the State *did* suppress evidence. *Hill v. Mitchell*, 2012 WL 995280, at *13–14. The district court concluded that Claim 4(c) was not a "new" claim because Hill based the original Claim 4(c) on the prosecution's history of suppressing evidence. *Id.* at *13. The district court's point is well taken; we agree that Hill had a colorable basis to suspect the State had suppressed evidence, and we agree that the State "is hardly in a position to invoke equitable principles." *Id.* at *14. We also recognize that Hill could not have included a *Brady* claim based on the undiscovered police report or grand jury testimony in his original habeas petition.

But that is exactly why Hill had one year from the discovery of the new evidence (under AEDPA or Rule 60(b)) to bring it to the district court's attention. Our disapproval of the State's actions does not excuse Hill's unexplained failure to present the police report for over three years *after he discovered it*.[3] We do not have the authority to simply ignore AEDPA's congressionally

---

[3]While we have said that "[d]elay by itself is not sufficient reason to deny a motion to amend," *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994), we did so before AEDPA was passed and in the context of a lawsuit brought under 42 U.S.C. § 1983—meaning AEDPA's statute of limitations was not a concern. Our subsequent

mandated requirements based on notions of equity.**4** Again, we may apply the Federal Rules of Civil Procedure only "to the extent that they are not inconsistent with any statutory provisions or [the habeas] rules." *Mayle*, 545 U.S. at 654. Hill asks us to do the opposite and use Rule 60(b) or Rule 15(c) to circumvent AEDPA's one-year limitations period, a request we cannot grant. *See Moreland v. Robinson*, 813 F.3d 315, 323 (6th Cir. 2016) ("Rule 60(b) motions and [Rule 15(c)] motions to amend may not be used as vehicles to circumvent the limitations that Congress has placed upon the presentation of claims in a second or successive application for habeas relief."). We therefore hold that the district court abused its discretion in bypassing AEDPA's statute of limitations to grant Hill's motion to amend (or reconsider) his *Brady* claim.**5** Because the claim is time-barred, the district court's award of conditional relief on Claim 4(c) must be reversed.

### D. Merits of the *Brady* Claim

Yet, even if we were to hold the *Brady* claim properly before the court, it should be found wanting on the merits, even on de novo review. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (where the state courts did not address the merits of the claim, the habeas court may review de novo).

---

cases quote this language from *Brooks* almost exclusively outside the habeas context. While we have quoted it with approval in the habeas context at least once, *see Coe*, 161 F.3d at 342, the petitioner in *Coe* filed his habeas petition and his amendments before AEDPA became effective, and thus AEDPA did not apply to the case. As there was no one-year statute of limitations for habeas claims prior to AEDPA, *see Lonchar v. Thomas*, 517 U.S. 314 (1996), *Coe* has no bearing here.

**4**The Supreme Court has held that AEDPA's statute of limitations is subject to equitable tolling, *Holland v. Florida*, 560 U.S. 631, 649 (2010), but the district court did not invoke equitable tolling and Hill does not argue that it would apply to his case. *Amici* mention equitable tolling in passing, *see* Amici Br. at 24, but the argument is wholly unpersuasive, and "[w]hile an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties." *Cellnet Commc's, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998) (internal citations omitted).

**5**The district court also noted that its original decision dismissing Claim 4(c) was "best characterized as an interlocutory order," which the court "ha[s] the inherent power to reconsider." *Hill v. Mitchell*, 2012 WL 995280, at *3. Fed. R. Civ. P. 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." As with Rule 60(b) and Rule 15(c), however, courts may not apply Rule 54(b) in a manner inconsistent with AEDPA. Because the court's prior decision was interlocutory, the court had the prerogative to revisit it, but it still lacked authority to disregard or circumvent AEDPA's period of limitation.

To succeed on a *Brady* claim, a petitioner must establish: (1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). There is no question that the State suppressed Officer Givens' police report and Teresa Dudley's grand jury testimony, and all agree that these materials could potentially have been favorable to the defense. However, we remain unpersuaded that the nondisclosure of these materials resulted in cognizable prejudice.

To show cognizable prejudice, Hill must establish that the suppressed evidence is material—that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (emphasis added). The question is whether "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435). Speculation about a different outcome is not enough; "'[t]he likelihood of a different result must be substantial, not just conceivable.'" *LaMar v. Houk*, 798 F.3d 405, 416 (6th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)). That is, the likelihood of a different result must be great enough to undermine confidence in the verdict. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (citing *Smith v. Cain*, 132 S. Ct. 627, 630 (2012)).

Hill's *Brady* claim rests on two items of marginal, speculative significance: (a) ambiguous comments in a preliminary police report; and (b) grand jury testimony given by Teresa Dudley that was not precisely consistent with her trial testimony.

**1. *Preliminary Police Report***

Officer Givens was the first officer to arrive after Dudley called the police to report that Domika was missing, and he prepared the police report the next morning. R. 219-4, Police Rep. at 1, Page ID 2298. One of the questions in the report asked, "Do you believe that this case could be solved with some additional investigative time?" *Id*. Givens circled "YES" and wrote "[i]nvestigate why the mother ran from police and asked for the police to check the alley behind

the house (several times)." *Id*. The report then asked for additional comments, and Givens wrote:

> Received radio call regarding family trouble. When we arrived Mother and Grandmother were lying on ground crying. The mother then told us she thinks the father took the baby. We searched the house and surrounding area. Notified Lieutenant, we then went to father's house. Gave consent to search. During search found nothing. Notified CIS they responded and had the Mother, Grandmother, and father come down for Question[.] CIS interviewed the above.

*Id*. at 2, Page ID 2299.

At trial, Givens testified that he arrived at Dudley's house around 12:15 a.m. on the night Domika disappeared and "saw a Teresa Dudley and her mother. They were laying on the ground crying. It was dispatched as family trouble. I got there and asked them what the problem was. And they said—Teresa said her baby was missing." Trial Tr. Vol. VIII, Givens Testimony at 1038. Givens then testified that he and another police officer searched the area, including the alley behind Dudley's house, and found nothing. *Id*. at 1038–39.

Two items in the police report are said to have potential impeaching value: (1) Givens' reference to an otherwise unsupported notion that Dudley ran from police; and (2) Givens' statement that Dudley asked the police to check "the alley behind the house" "several times." R. 219-4, Police Rep. at 1, Page ID 2298. The district court held that the report was material *Brady* evidence because it "casts far more suspicion on Teresa Dudley than any evidence at trial did." R. 226, Dist. Ct. Op. at 9, Page ID 2393. A closer look, however, reveals that the report has much less probative value than the district court surmised.

*Dudley Running from Police*. The district court inferred from the report that "Dudley fled from police when they first approached her . . . . [I]nformation that a young mother who frantically called police when her baby went missing actually fled from police when they first approached her constitutes vital, powerful evidence as to her credibility." *Id*. at 10, Page ID 2394 (emphasis added). But this comment in the police report is hardly "evidence" at all; it reflects a question in Givens' mind. And the inference drawn by the district court is directly contradicted both by the contents of the report itself and by Givens' trial testimony. The district court's assumption that Dudley ran when police first approached her is otherwise unsupported in

the record. The comment suggests someone told Givens that Dudley "ran from police;" it does not indicate *when* she may have run, or *who* reported her running. Givens, the first officer on the scene, wrote that "[w]hen we arrived [Dudley] and Grandmother were lying on [the] ground crying." R. 219-4, Police Rep. at 2, Page ID 2299. Givens confirmed this account at trial, testifying that Dudley and her mother were lying on the ground crying when police first arrived. Trial Tr. Vol. VIII, Givens Testimony at 1038. If Dudley ran, there is no evidence she did so when the police first approached.

Certainly, Hill's counsel could have asked Givens about the "ran from police" comment, its source, and whether he did investigate the matter. Counsel also could have asked Dudley whether she actually ran and, if so, why. But the notion that those questions would have yielded answers tending to exculpate Hill or impeach either Givens or Dudley is a matter of sheer speculation. Several witnesses and police officers were with Dudley that night, and not a single one of them testified that she ran from police. The report, at most, suggested only a potential line of questioning that might have led to something impeaching. Standing alone, the "ran from police" comment is not nearly as incriminating of Dudley as the district court suggested and its impeachment value is wholly speculative. That is, the likelihood that inquiry would have led to any evidence favorable to the defense at all is speculative. Even more remote is the likelihood that inquiry would have led to evidence so exculpatory or impeaching as to undermine confidence in the outcome.

*Dudley Asking Police to Check the Alley.* The second item in the report is the reference to Dudley's asking police to "check the alley behind the house." *Id*. at 1, Page ID 2298. The district court used this comment to conclude that the report "gives rise to a reasonable suspicion that Dudley had knowledge not only that her baby was dead but also about where the baby's body was—before the body was found and at a time when Dudley was purporting to search for her missing daughter"—"giv[ing] rise to at least an inference that Dudley was responsible for the baby's death." R. 226, Dist. Ct. Op. at 10, Page ID 2394.

Again, the district court's sweeping conclusion rests on inferences and assumptions that simply are not reasonably supported in the record. The court pointed out that Domika's body was found in a formula box in a vacant lot behind Hill's house, and that the formula box had

previously been located in an alley behind Hill's house. *Id*. From these facts, the court inferred that Dudley's reference to the alley behind the house indicates she knew exactly where Domika was, that she knew Domika was dead, and that she was giving the police the location of her body. But the record provides a simple, more likely explanation for Givens' statement: Dudley was asking the police to search the alley behind her own house, and for good reason.

When Dudley realized Domika was missing, she ran out of her house screaming that Domika was gone. Trial Tr. Vol. VIII, Janson Testimony at 980; Dudley Testimony at 1009. Her friends Barbara Sue Janson and Pamela Lewis told her that they had just seen Hill enter her house through the front, but did not see him leave. Trial Tr. Vol VIII, Janson Testimony at 980, Lewis Testimony at 994–95, Dudley Testimony at 1003. The only exit aside from the front door is through an alley behind Dudley's house. See Trial Tr. Vol. VIII, Janson Testimony at 980, Lewis testimony at 991, Dudley Testimony at 1014–15; see also R. 237-1, Officer Hennekes Grand Jury Testimony at 3–4, 6, Page ID 2583–84, 2586 ("There is an alley that runs in the rear of [Dudley's house] that is accessible from that address. . . . You can walk back the side [of the house] and get to the alley without ever coming back out front."). Dudley thus likely asked the police to check the alley behind *her own house* because (1) her baby was missing, (2) her friends told her that Hill had just been in her house, and (3) the only way he could have left without being seen was through the alley behind her house.[6]

The actual events of the evening support this explanation, because the police did check the alley behind Dudley's house. The report itself notes that police "searched the whole [of Dudley's] house which includes the attic[,] the alley behind the house[,] and the father's house." R. 219-4, Police Rep. at 1, Page ID 2298 (emphasis added). Officer Givens then testified at trial, consistent with the report, that the police searched the alley behind Dudley's house the night Domika disappeared. Trial Tr. Vol. VIII, Givens Testimony at 1038–39. He added that the police did not search outside Hill's house that night. *Id*. at 1044. If, as the district court assumed, Dudley repeatedly asked police to check the alley behind Hill's house, why didn't they

---

[6]Additional evidence in the record supports the conclusion that Dudley was telling police to check behind her own house. The police report itself refers to "the house" numerous times, each instance referring to *Dudley's* house. *See* R. 219-4, Police Rep. at 1, Page ID 2298 (noting that witnesses saw Hill "around the house" and saw him "enter[] the house"). And when the report refers to Hill's house, it does so explicitly. *See id.* (noting that police "searched the house and surrounding area," and only "then went to father's house").

look there?  Because, to use Occam's razor, Dudley did not ask police to check the alley behind Hill's house; she asked them to check the alley behind her own.**[7]**  It follows that the potential impeaching value of this comment in the police report is practically nil.  If Hill's counsel had asked Dudley what she meant, her explanation would likely have been totally innocuous.  There is no reason in the record to assume as the district court did.

What we are left with, after excising the district court's assumptions, is a police report that alludes to two items of ambiguous significance:  first, that Dudley might have run from police at some point; and second, that Dudley asked the police to check the alley behind someone's house for evidence relating to Domika's disappearance—most likely her own house, because she thought Hill took her baby and left through that alley.  Yet, despite the obvious ambiguity of the two items, the district court granted habeas relief without even conducting an evidentiary hearing on the materiality of the police report.  In fact, Hill did not even request one.**[8]** From this, it is hard to avoid the conclusion that Hill's counsel realized the police report was more significant for its speculative value.  That is, counsel likely realized that an evidentiary hearing posed the risk that entirely innocent explanations for both comments would be exposed; better to let the police report speak for itself and hope that its nondisclosure by the police is deemed to justify an adverse inference.  The strategy apparently worked in the district court, but careful scrutiny reveals that Hill has failed to meet his burden of showing materiality.  The police report comments simply do not carry the weight the district court assigned to them.

### 2. *Grand Jury Testimony*

Dudley's grand jury testimony is even less helpful to Hill's case.  Before the grand jury, Dudley was asked whether Domika had barrettes in her hair the night she disappeared.  She testified:

---

**[7]**"[O]f two competing theories, the simpler explanation . . . is to be preferred." *Occam's Razor*, ENCYCLOPEDIA BRITANNICA, http://www.britannica.com/topic/Occams-razor (last visited June 21, 2016); *see also* OXFORD ENGLISH DICTIONARY (3d ed. 2004) (defining Occam's razor as "[t]he principle that in explaining anything, no more assumptions should be made than are necessary").

**[8]**Hill requested an evidentiary hearing to show ineffective assistance of counsel, R. 229, Motion at 11–12, Page ID 2427–28, but Hill's counsel admitted at oral argument that Hill never requested an evidentiary hearing on either the police report or the grand jury testimony.

A.      She had three in her hair.  She had a pink one on one side with some teddy bears, then she had a pink one with a blue teddy bear, and she had a yellow one at the top.

When we went down there that morning, me, Denise and Ranisha, we went looking up towards my house.  And we came back down.  They started looking in the garage and I was standing outside the garage.  And I looked down.  There was a barrette right there . . .  I was like, there, that is her barrette right there.  Ranisha looked up, picked it up and gave it to me.

R. 237-1, Dudley Grand Jury Testimony at 18, Page ID 2598.  At trial, Dudley testified:

A.      Me, Barbie, and Pam, we went down there, and Ruby was standing outside, and Denise.  Then Denise give me a shirt and I set down there.  And they say "We help her look for her, if you want me to."  Denise and Ronessa, they had helped me look for her that night.

We had went up in our park, where I live, and we came back down, we started looking in the garages.  And I went down and her barrette was right there and I found it.  They say "You sure this is your baby barrette?"  And I was like, "Yeah."

Q.      How many barrettes?  How many barrettes was your baby wearing—

A.      Three.

Q.      —when she went to bed that night?

A.      Three.

Q.      Do you remember what color they were?

A.      Yeah, yellow, and there was a blue one with a pink teddy bear.  I forgot the other color, I know it was three barrettes.

Q.      Okay.  I will show you, you said you found a barrette in the garage at [Hill]'s house that morning?

A.      Yeah.

Q.      I will show you what's been marked as State's Exhibit Number 13, and ask you if you have ever seen this little blue barrette with the pink teddy b[e]ar on it before?

A.      Yeah, it was in her hair.

Q.      Was it in her hair when she was asleep with you that night?

A.      Yeah, because I had did her hair earlier.

Q.      And you saw, found that in [Hill]'s garage?

A.      Just sitting there.

Trial Tr. Vol. VIII, Dudley Testimony at 1012–14.

Hill points to two inconsistencies between Dudley's grand jury testimony and her trial testimony: (1) the identity of Dudley's companions when she searched the garage and found the barrette; and (2) the barrette's location when Dudley found it. These inconsistencies—to the extent they even exist—are inconsequential and disclosure of the grand jury testimony would have had no impact at Hill's trial.

*Who Searched the Garage?* At trial, Dudley testified that Denise (Hill's aunt) and Ronessa—Denise's daughter and Hill's cousin—helped her look for Domika that night. *Id*. at 1012. Denise and Ronessa confirmed this account at trial, testifying that they were helping Dudley search in the garage when Dudley found the barrette. Trial Tr. Vol. X, Denise Hill Testimony at 1247–49; Ronessa Hill Testimony at 1366–67. Before the grand jury, Dudley testified that Denise and "Ranisha," rather than "Ronessa," helped her search the garage. Dudley explained that "Ranisha" is Hill's cousin, and her last name is Hill. R. 237-1, Dudley Grand Jury Testimony at 19, Page ID 2599.

This "inconsistency"—calling Hill's cousin "Ranisha" instead of "Ronessa"—again has a simple explanation: Dudley incorrectly called Ronessa by the name "Ranisha" before the grand jury.[9] There is no person named "Ranisha" involved in this case, and Dudley, Denise, and Ronessa all testified at trial that they were searching the garage when Dudley found the barrette. Trial Tr. Vol. VIII, Dudley Testimony at 1012; Trial Tr. Vol. X, Denise Hill Testimony at 1247–48; Ronessa Hill Testimony at 1373–74. While there may be a nominal discrepancy in the grand

---

[9]Alternatively, the court reporter may have made an aural transcription error. Either way, the discrepancy is immaterial.

jury testimony, there is no substantial reason to believe Dudley identified two different persons.**10**

*Whether the Barrette was Inside or Outside the Garage*. The second alleged inconsistency is similarly overblown. Before the grand jury, Dudley testified that she was "standing outside the garage" and saw the barrette when she "looked down." R. 237-1, Dudley Grand Jury Testimony at 18, Page ID 2598. At trial, she testified that she "started looking in the garage[,] [a]nd I went down and her barrette was right there and I found it." Trial Tr. Vol. VIII, Dudley Testimony at 1012–13. The district court inferred that Dudley's grand jury testimony indicated she found the barrette outside the garage, while her trial testimony indicated she found it inside the garage. R. 240, Dist. Ct. Op. at 19, Page ID 2685. Hill makes the same argument on appeal.

But Dudley did not testify that she found the barrette outside the garage before the grand jury. She only said that she was standing outside the garage when she saw it. That is not inconsistent with her trial testimony, as she testified that the barrette was "[r]ight in the opening" of the garage. Trial Tr. Vol. VIII, Dudley Testimony at 1027. Dudley also testified before the grand jury that Ronessa ("Ranisha") was the one who picked up the barrette, and Ronessa was inside the garage. As all of the record evidence indicates the barrette was inside the garage, there is no inconsistency between Dudley's grand jury testimony and her trial testimony. To the extent the district court imagined or inferred a material discrepancy, again, the appropriate recourse was to conduct an evidentiary hearing. That none was conducted or even requested is telling.

After we again eliminate the unsupported assumptions in the district court's analysis, the only "inconsistency" in the grand jury testimony is the mix-up with Ronessa's name. This is a minor discrepancy. If it had been disclosed to Hill prior to trial, it would almost certainly have

---

**10**In reasoning to the contrary, the district court made two incorrect assumptions. First, the court assumed that Dudley testified at trial that "Barbie and Pam," rather than Denise and Ronessa, were with her when she found the barrette. While Dudley testified that "Barbie and Pam" accompanied her to Hill's house, Dudley, Denise, and Ronessa all confirmed that *they* searched the garage. Second, the court appeared to assume, as Hill now argues, that Dudley testified before the grand jury that "Denise and Ranisha" were *her own* cousins. R. 240, Dist. Ct. Op. at 19, Page ID 2685. That conclusion is unsupported in the record, as Dudley actually testified before the grand jury that Ranisha (Ronessa) was *Hill's* cousin, and the only Denise involved in this case is *Hill's* aunt. R. 237-1, Dudley Grand Jury Testimony at 19, Page ID 2599.

been easily explained away.  There is no reason to believe that Hill would have been able to use it to so effectively impeach Dudley's credibility as to undermine confidence in the outcome of the trial.

### 3. *Collective Impact*

Still, despite the limited probative value of the police report comments and the grand jury testimony, we must "consider the effect of the suppressed evidence collectively, rather than item by item." *Jalowiec*, 657 F.3d at 305 (citation and internal quotation marks omitted). Collectively, then, we have a police report suggesting Dudley may have run from police at some point and that she told police to check an alley behind someone's house, and we have grand jury testimony suggesting Dudley was heard to pronounce Hill's cousin Ronessa's name differently than she did during Hill's trial.  Hill contends the nondisclosure of these items was prejudicial because he could have used them to undermine the credibility of the prosecution's most powerful witness, the only person tying Hill to Domika's murder.

Hill's argument fails to account for the substantial evidence against Hill from witnesses other than Teresa Dudley.  Barbara Janson and Pamela Lewis both testified that they saw Hill enter Dudley's house, but did not see him leave.  Trial Tr. Vol VIII, Janson Testimony at 980, Lewis Testimony at 994–95.  Hill admitted at trial that he entered Dudley's home the night Domika disappeared.  Trial Tr. Vol. X, Genesis Hill Testimony at 1405–06.  Officer Givens testified that Hill lied initially about being in Dudley's house, denying that he had been there at all the night Domika disappeared.  Trial Tr. Vol. VIII, Givens Testimony at 1051.  Officers Robert Steinher and Charles Beaver testified that they found Domika's body in a vacant lot behind Hill's house.  *Id.*, Steinher Testimony at 1084, Beaver Testimony at 1097–98.  Officer Robert Hennekes testified that police found her body in a formula box that was traced back to Hill's house.  *Id.*, Hennekes Testimony at 1065–67.  A forensic expert testified that the trash bags wrapped around Domika's body matched trashed bags from Hill's home.  Trial Tr. Vol. IX, William Dean Testimony at 1170–71.  Officer Steinher testified that those trash bags were secured with electrical tape, and that Hill's uncle was unable to find the electrical tape he normally kept in his tool box.  Trial Tr. Vol. VIII, Steinher Testimony at 1088.  Finally, a bus driver picked Hill out of a photo array and testified that he saw a passenger matching Hill's

description who said he "could not believe what he had done to a little baby" and feared he would "get the chair for it." Trial Tr. Vol. IX, Patrick Ormond Testimony at 1138–40.

Now consider the evidence Dudley provided. Yes, she testified that she found the barrette in Hill's garage, but that is the only evidence for which Dudley is the sole link. Trial Tr. Vol. VIII, Dudley Testimony at 1012–14. Other witnesses independently tied everything else to Hill. Dudley testified that Hill told her "I bet I don't pay" child support—but Barbara Sue Janson also testified that she overheard a conversation between Hill and Dudley about child support where Hill said he'd "kill that little bitch before he paid anything." *Id.*, Janson Testimony at 981–82. Dudley testified that Hill once threw a brick through her window—but Hill also admitted doing so at trial. Compare Trial Tr. Vol. VIII, Dudley Testimony at 1005, with Trial Tr. Vol. X, Hill Testimony at 1415–16. Dudley testified that the lightbulb outside her bedroom was unscrewed right after Domika disappeared—but Hill also admitted unscrewing it. Compare Trial Tr. Vol. VIII, Dudley Testimony at 1008, with Trial Tr. Vol. X, Hill Testimony at 1411. Dudley testified that Hill did not look worried when she told him Domika was missing— but Officer Givens independently testified that Hill was "snickering" and "grinning" at Dudley when the police asked him if he took the baby. Trial Tr. Vol. VIII, Givens Testimony at 1050–51. Finally, Barbara Sue Janson, the State's first witness, testified that she was "positive" she had seen Hill wear the shirt in which Domika's body was found wrapped, or one that "look[ed] just like it." Trial Tr. Vol. VIII, Janson Testimony at 980–81, 987–88.

Hill also fails to explain how the availability of the police report and the grand jury testimony would have changed anything at Hill's trial when set against this substantial evidence. Even if we give some limited weight to the suppressed evidence, it would, at most, have been used to marginally impeach the credibility of Teresa Dudley. It would have had no impact on nearly all of the evidence—evidence from witnesses other than Dudley. Speculation about whether Dudley told police to check in an alley does not give rise to such a substantial likelihood of a different result as to "undermine confidence in the jury's verdict." *Wearry*, 136 S. Ct. at 1006. Such speculation certainly does not rise to the level of a "reasonable probability that . . . the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433. The late-disclosed items are simply not material.

In summation, Hill brought the suppressed evidence to the district court's attention well outside AEDPA's one-year statute of limitations period, and we cannot cast aside AEDPA's procedural bars using our own considerations of equity. And even if Hill's *Brady* claim were properly before the court, it would fail on the merits. On the present record—absent unsupported assumptions and unfounded speculation—Hill has fallen far short of carrying his burden of showing a reasonable probability that disclosure of the police report or Dudley's grand jury testimony would have altered the jury's verdict. Because *Brady* evidence must be material to warrant relief, and because this evidence is not material, the district court's award of relief on this claim must be reversed.

**IV**

Having determined that habeas relief was improperly granted on Hill's *Brady* claim, we must now address the five claims of error Hill presents on cross-appeal, challenging the district court's denial of his other habeas claims. Hill brings claims based on (a) sufficiency of the evidence; (b) ineffective assistance of counsel at the penalty phase; (c) ineffective assistance of counsel on direct appeal; (d) an argument that Ohio's proportionality review is unconstitutional; and (e) a claim for cumulative error. We find each unpersuasive.

**A. <u>Ninth Ground:</u> Sufficiency of the Evidence**

Hill first challenges the sufficiency of the evidence supporting his conviction. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard is even more exacting on habeas, as we are reviewing the Ohio Supreme Court's decision denying Hill's claim on the merits and must do so through AEDPA's deferential lens. Under this standard, even if we were to "conclude that a rational trier of fact could *not* have found the petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state *appellate court's* sufficiency determination as long as it is not unreasonable." *Brown v. Koteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing 28 U.S.C. § 2254(d)(2)).

Hill's appeal focuses on the lack of direct evidence implicating him and asserts that the circumstantial evidence was insufficient to support a conviction. However, "[c]ircumstantial evidence may support a conviction, and such evidence need not remove every reasonable hypothesis except that of guilt." *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006) (citations omitted). Hill also attacks the credibility of many witnesses who testified, but we cannot substitute our own determination of guilt in place of the jury's, and we cannot reweigh the evidence. *See Herrera v. Collins*, 506 U.S. 390, 401–02 (1993); *Brown*, 567 F.3d at 205.

The evidence against Hill was substantial, even if largely circumstantial. Teresa Dudley, Domika's mother, testified that Hill told her "I bet I don't pay" child support. Trial Tr. Vol. VIII, Dudley Testimony at 1012–14. Barbara Sue Janson testified that she heard Hill tell Dudley he would "kill that little bitch before he paid anything." *Id.*, Janson Testimony at 981–82. Two witnesses testified that they saw Hill enter Dudley's house the night Domika disappeared, but did not see him leave. Trial Tr. Vol. VIII, Janson Testimony at 980, Lewis Testimony at 994–95. Hill admitted at trial that he entered Dudley's home the night Domika disappeared and unscrewed the lightbulb in the hallway outside her room. Trial Tr. Vol. X, Genesis Hill Testimony at 1405–06. The next morning, Dudley searched Hill's garage with Hill's aunt and cousin and found one of the barrettes she placed in Domika's hair the night before. Trial Tr. Vol. VIII, Dudley Testimony at 1012–14. Officers Robert Steinher and Charles Beaver testified that they found Domika's body in a vacant lot behind Hill's house. Trial Tr. Volume VIII, Steinher Testimony at 1084, Beaver Testimony at 1097–98. Officer Robert Hennekes testified that the police found Domika's body in a formula box that was traced back to Hill's house. *Id.*, Hennekes Testimony at 1065–67. A forensic expert testified that the trash bags wrapped around Domika's body matched trash bags from Hill's home. Trial Tr. Vol. IX, William Dean Testimony at 1170–71. Officer Steinher testified that those trash bags were secured with electrical tape, and that Hill's uncle (who he lived with) was unable to find the electrical tape he normally kept in his tool box. Trial Tr. Vol. VIII, Steinher Testimony at 1088. Dudley and Janson testified that Domika's body was wrapped in a shirt that "look[ed] just like" one Hill owned. Trial Tr. Vol. VIII, Dudley Testimony at 1005, Janson Testimony at 980–81, 987–88. Finally, a bus driver picked Hill out of a photo array, though at trial the driver clarified he identified Hill based on size and height and "could not really honestly say that it would be him or

not." Trial Tr. Vol. IX, Patrick Ormond Testimony at 1138–41. The driver testified that he saw a passenger matching Hill's physical description say he "could not believe what he had done to a little baby" and feared he would "get the chair for it." *Id.* Under the doubly deferential standard of *Jackson v. Virginia* and AEDPA, this evidence was sufficient for a rational trier of fact to find the essential elements of Hill's crimes beyond a reasonable doubt. We therefore affirm the district court's denial of Hill's challenge to the sufficiency of the evidence.

### B. Twelfth Ground: Ineffective Assistance of Trial Counsel—Penalty Phase

Hill next raises a three-part claim for ineffective assistance of trial counsel (IATC) during the penalty phase of his trial. He asserts counsel was constitutionally ineffective for (1) failing to obtain a mitigation expert; (2) failing to hire an independent mental health expert; and (3) failing to adequately prepare lay witnesses (referred to as sub-parts (1), (2), and (3)).

#### 1. *Background*

*Direct Appeal.* Following his conviction, Hill raised an IATC on direct appeal based on trial counsel's alleged failure to object to misconduct by the prosecution. R. 42, Direct Appeal at 46–52, Page ID 4139–45. The Ohio Court of Appeals and the Ohio Supreme Court denied the claim on the merits. *Hill*, 661 N.E.2d at 1083. Hill did not, however, bring any claims based on counsel's alleged failure to hire a mitigation expert (sub-part (1)), failure to hire a mental health expert (sub-part (2)), or failure to adequately prepare witnesses (sub-part(3)).[11]

*First State Post-Conviction Petition.* Hill filed his first petition for state post-conviction relief on September 20, 1996, raising a version of sub-parts (1), (2), and (3) for the first time. In that petition's second claim for relief, Hill argued that trial counsel was ineffective for failing to conduct an adequate search for an expert and failing to obtain an independent mental health expert. R. 47, First State Post-Conviction Petition at ¶¶ 41–60, Page ID 5384–90. He primarily argued that trial counsel was ineffective for relying on court clinic psychologist Dr. Nancy Schmidtgoessling during the mitigation phase. *Id.* To support these allegations, Hill included two affidavits from attorney "experts" and a transcript of Dr. Schmidtgoessling's deposition from an unrelated habeas case. R. 47, Affidavits of Steven R. Keller and Gerald G. Simmons,

---

[11]Hill's federal habeas petition had five parts, but sub-parts (4) and (5) are not at issue in this appeal.

Page ID 5470–81; Schmidtgoessling Dep., Page ID 5482–5627.  Hill also noted that Schmidtgoessling's office did not have mitigation specialists, which he argued would have been "[o]f critical importance" to his case.  R. 47, First State Post-Conviction Petition at ¶ 47, Page ID 5385–86.

In another claim for relief, Hill argued that trial counsel did not conduct an adequate investigation or prepare mitigation witnesses to testify.  *Id.* at ¶¶ 56–57, Page ID 5388–89.  To support these allegations, Hill cited the attorneys' affidavits but also included affidavits from his mother and three aunts.  R. 47, Affidavits of Keller and Simmons, Page ID 5470–81; Affidavits of Mary E. Hill, Denise Hill, Jennifer Clark, and Ruby Hill, Page ID 5637–44.

The trial court denied Hill's petition on the merits without a hearing, finding that Hill's claims were "unsupported by evidentiary documents."  R. 48-2, Trial Ct. Op. at 4–5, 13, Page ID 5981–82, 5990.  The Ohio Court of Appeals affirmed on procedural grounds, holding that "[a]ll the ineffective-assistance claims that Hill asserts in his postconviction petition could have been brought on direct appeal."  *Hill*, 1997 WL 727587, at *1.  The Ohio Supreme Court denied discretionary review.  *State v. Hill*, 690 N.E.2d 1288.

*Second State Post-Conviction Petition.*  Hill filed a second state post-conviction petition on February 18, 2000, over three years after his first petition.  As his third ground for relief in that petition, he asserted another claim that trial counsel was ineffective for failing to retain an independent mental health expert.  R. 262, Second State Post-Conviction Petition at 18–20, Page ID 6458–60.  His primary evidentiary support was an affidavit from Dr. Michael Gelbort, who recounted a number of events Hill reported from his upbringing and concluded that Hill had "long-standing" "organic brain impairment" that "would have been in effect at the time of the criminal act in question."  R. 262, Gelbort Aff. at 6, ¶ 25, Page ID 6505.

The trial court denied the petition on procedural grounds because it "d[id] not meet or address the criteria required by [Ohio Revised Code] 2953.23 for a second petition."  R. 262, Entry Declining to Entertain Second Petition to Vacate, Page ID 6765.  The Ohio Court of Appeals affirmed, concluding that section "2953.23(A) precluded the [trial] court from entertaining [Hill's] tardy and successive petition."  R. 263, Ohio Ct. App. Judgment Entry at 2,

Page ID 6849.  The Ohio Supreme Court again denied discretionary review.  *State v. Hill*, 808 N.E.2d 398.

## 2. *Procedural Default*

The district court denied sub-part (1) (failure to hire a mitigation specialist), sub-part (2) (failure to hire an independent mental health expert), and part of sub-part (3) (failure to prepare witnesses) as procedurally defaulted.  *Hill v. Mitchell*, 2006 WL 2807017, at *59.  We review whether a petitioner's federal habeas claim is barred by procedural default *de novo*.  *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013).

*Ohio's Procedural Bar—Res Judicata.*  Ohio has two forms of IATC claims.  *McGuire v. Warden*, 738 F.3d 741, 751 (6th Cir. 2013), *cert. denied, McGuire v. Robinson*, 134 S. Ct. 998 (2014).  Claims based on evidence wholly *within* the trial record must be brought on direct appeal, while claims based on evidence *outside* the trial record cannot be brought on direct review and must be raised in a petition for state post-conviction relief.  *Id.*  (citing *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982)).  In this dual-track system, *res judicata* bars an IATC claim brought in a state post-conviction petition that relies on evidence within the trial record, because such a claim could have been brought on direct appeal.  *Id.*  (citing *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967).  While a claim based on evidence outside the record must be brought in a petition for post-conviction relief, Ohio courts require extra-record evidence to satisfy "some threshold standard of cogency" before allowing the claim to proceed.  *Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (quoting *State v. Lawson*, 659 N.E.2d 362, 367 (Ohio Ct. App. 1995)).  Ohio imposes this minimum threshold because otherwise "it would be too easy to defeat the [*res judicata* bar] by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery."  *Id.*

Hill did not raise the arguments in sub-parts (1), (2), or (3) on direct appeal in state court. When Hill brought them in his first petition for state post-conviction relief, the Ohio Court of Appeals held that they were procedurally barred by *res judicata* because Hill could have brought them on direct appeal.  *Hill*, 1997 WL 727587, at *1.  The district court agreed on sub-parts

(1) and (2) because Hill's only extra-record evidence were unpersuasive attorney "expert" affidavits and Dr. Schmidtgoessling's deposition testimony from an unrelated case. *Hill v. Mitchell*, 2006 WL 2807017, at \*55–56. As for sub-part (3), the district court found that it could not consider the allegations in Hill's second post-conviction petition because Hill did not include them in his first petition. *Id.* at \*57. The court then found that some of the allegations of Hill's first state post-conviction petition relied on evidence outside the trial record and concluded that the Ohio Court of Appeals incorrectly applied *res judicata* because Hill could not have raised them on direct appeal. *Id.* (citing *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001)).

Neither Hill nor the State contests these findings. Hill argues that we should excuse any procedural default—and so address the merits of his claims—because he can show cause and prejudice on the basis of ineffective assistance of post-conviction counsel under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

### 3. *Cause and Prejudice*

"There is no constitutional right to an attorney in state post-conviction proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). Therefore, ineffective assistance of counsel in those proceedings generally cannot serve as a cause for procedural default. *Id.* In *Martinez*, however, the Supreme Court carved out a "narrow exception," holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of counsel at trial," but only when "state law *requires* that an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.'" *Trevino*, 133 S. Ct. at 1918 (quoting *Martinez*, 132 S. Ct. at 1315, 1320). The Supreme Court expanded this exception in *Trevino*, holding that it applied in Texas even though Texas criminal procedure "on its face appears to permit (but does not require) the defendant to raise the claim of [ineffective assistance of trial counsel] on *direct appeal*." *Id.* The Supreme Court concluded "that the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921. Thus, the *Trevino* Court held that the *Martinez* exception applied because the petitioner's first real opportunity to present the claim was in an initial-review collateral proceeding. *Id.*

Hill argues that *Trevino* and *Martinez* apply in Ohio because, like Texas, "Ohio's procedural framework fails to provide a meaningful opportunity to litigate claims of ineffective assistance of counsel on direct review." Hill Br. at 71. Hill's assertion is incorrect on its face and belied by his own case, as he *was* able to (and did) raise IATC claims on direct appeal, albeit on different grounds. *See* R. 42, Direct Appeal at 46–52, Page ID 4139–45. And prior to *Trevino*, we held that *Martinez* does not apply in Ohio because Ohio permits (in fact, requires) that defendants bring within-record IATC claims on direct appeal. *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013). We have yet to decide whether *Trevino* applies in Ohio, but we have suggested it may not on multiple occasions. *See, e.g.*, *Landrum v. Anderson*, 813 F.3d 330, 336 (6th Cir. 2016); *Henness v. Bagley*, 766 F.3d 550, 556–57 (6th Cir. 2014); *McGuire*, 738 F.3d at 752.

Ohio's dual-track system for IATC claims complicates matters with respect to *Trevino*. In *McGuire*, we noted that "one could argue that the category requiring evidence *outside* the record must be brought on collateral review in order for review to be meaningful," suggesting the possibility that the *Martinez* exception could apply for that category of IATC claims. 738 F.3d at 751–52. But we also explained that, in the "'ordinary'" Ohio case, "'ineffective assistance of counsel at mitigation, just like ineffective assistance at trial, is an issue that can be brought on direct appeal.'" *Id.* at 752 (quoting *State v. Combs*, 652 N.E.2d 205, 212 (1994) (collecting Ohio cases)). "Arguably, then, the review of trial counsel ineffectiveness claims in Ohio is more 'meaningful' than Texas, because in Ohio there is 'ordinarily' the availability of direct review with a constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required." *Id.* We chose not to answer the question in *McGuire*, as our discussion merely "show[ed] that the application of *Trevino* to Ohio ineffective-assistance claims is neither obvious nor inevitable." *Id.* We have not answered it since. *See Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2016). We do not do so today, because even if *Trevino* applies, Hill cannot satisfy the requirements of the *Martinez* exception.**[12]**

---

**[12]**Both parties' briefing regarding the applicability of *Trevino* and *Martinez* in Ohio left much to be desired.

**4.** *Ineffective Assistance of Trial Counsel*

To establish cause to excuse his procedural default, Hill must satisfy all four requirements of *Martinez*, as explained in *Trevino*:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino*, 133 S. Ct. at 1918 (quoting *Martinez*, 132 S. Ct. at 1318–21). To excuse his procedural default, then, Hill must show that he has a "substantial" claim of ineffective assistance of trial counsel at the penalty phase. Substantial claims are those that a petitioner shows have "some merit" under *Strickland v. Washington*, 466 U.S. 668 (1984). *Morrow v. Tennessee*, 588 F. App'x 415, 422 (6th Cir. 2014) (quoting *Martinez*, 132 S. Ct. at 1318–19). Even then, to prevail, Hill must show that trial counsel actually *was* constitutionally ineffective. He cannot do so.[13]

Because sub-parts (1), (2), and (3) of Hill's IATC claim were denied based solely on procedural grounds, we review the merits *de novo*. *Barton v. Warden, S. Ohio Correctional Facility*, 786 F.3d 450, 459–63 (6th Cir. 2015).[14] "To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that it prejudiced him." *McGuire*, 738 F.3d at 752 (citing *Strickland v*, 466 U.S. at 687. This standard has two prongs:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

---

[13]Our analysis of whether Hill can show a "substantial" IATC claim is identical to whether Hill can actually prevail on his IATC claim.

[14]Although the state trial court denied a version of sub-parts (1), (2), and (3) of Hill's claim on the merits, our precedent indicates that the decision is not entitled to AEDPA deference. *Barton*, 786 F.3d at 462. To receive AEDPA deference, the state courts must have "adjudicated [the claim] on the merits." 28 U.S.C. § 2254(d). To determine whether a state court adjudicated the claim on the merits, "federal courts [are] to 'look through' and defer to the 'last reasoned state-court opinion' that addressed the matter." *Barton*, 786 F.3d at 462. In *Barton*, we explained that, even if a trial court decides a claim on the merits, that decision is "stripped of any preclusive effect under the last-reasoned decision rule" when the state appellate court affirms the trial court's decision "entirely based on a procedural bar." *Id.* at 463.

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. With respect to the first prong, our scrutiny of defense counsel's performance must be "highly deferential." *Id.* at 689. "Because of the difficulties inherent in making the evaluation, [we] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* As for the second prong, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. However, if we determine that a petitioner has failed to satisfy one prong, we need not consider the other. *Id.* at 697. Here, Hill cannot show that his trial counsel's performance at the penalty phase was deficient.

Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. A petitioner may show trial counsel was ineffective for failing to conduct an adequate investigation of a defendant's family background and mental health history. *See Poindexter v. Mitchell*, 454 F.3d 564, 577–78 (6th Cir. 2006) (collecting cases). "Our circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008) (citing *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001); *Moore v. Parker*, 425 F.3d 250, 255 (6th Cir. 2005). A comparison of the mitigation evidence presented with the evidence Hill argues effective counsel would have found demonstrates that counsel did conduct an adequate investigation and that counsel's performance was not deficient.

(a) *Evidence Presented in Mitigation*

The district court provided a thorough analysis of the substantial mitigation evidence Hill's trial counsel presented during the penalty phase of his trial. *Hill v. Mitchell*, 2013 WL 1345831, at *62–65. Hill's counsel presented evidence from eight of Hill's family members, two friends, Hill's former juvenile probation officer, Hill himself, and Dr. Schmidtgoessling, a

psychologist who served as a mental health expert to assist in Hill's mitigation case. *Id.* at \*62. These witnesses provided a full picture of Hill's mitigation case, as recounted by the district court:

> From [Hill]'s relatives and friends, defense counsel elicited evidence that [Hill] had numerous relatives from both sides of his family with whom he was close-many of whom expressed disbelief that [Hill] had done what he was accused of; that [Hill] had had some run-ins with the law as a juvenile and grew up in a bad neighborhood rife with gangs and drugs; that [Hill] became involved with drugs to survive and to obtain things he needed; that [Hill] was kind, gentle, and helpful; that [Hill] had a good but sometimes troubled relationship with his mother, stemming from the fact that she could not always provide for her children, that none of the fathers of her children provided support, and that she suffered severe bouts with depression due to several lost pregnancies; that [Hill] and his father professed to love each other even though they had virtually no relationship and very little contact—a matter that often left [Hill] sad and depressed; that [Hill]'s mother and father never lived together or had a relationship; that [Hill]'s father had served five years in prison; that [Hill] had struggled in school, particularly in math, despite sometimes demonstrating a desire to finish school and find a job; that [Hill] had spent some time at Hillcrest school for troubled boys; that [Hill] had subsequently spent time at Millcreek juvenile mental health facility due to suicidal thoughts, a drug overdose, severe depression with psychotic features, and hearing voices that told him to harm himself. The record demonstrates that much of the information provided by [Hill]'s relatives was pried from them by specific, probing questions by defense counsel—demonstrating counsel's familiarity with the information those relatives possessed but were not always prepared to divulge.
>
> From juvenile court social workers, defense counsel presented more detailed evidence about [Hill]'s stay at Hillcrest; the efforts (albeit failed) that [Hill] made to stop abusing drugs and alcohol and maintain a job; [Hill]'s respectful disposition; the struggles that [Hill]'s brother Marcus also experienced with the law and severe depression; the effect that [Hill]'s noisy, wild, chaotic neighborhood had on [Hill]; the manner in which [Hill] had to align himself with gangs and/or drug dealers for protection; [Hill]'s abuse or at least use of alcohol and drugs beginning in his teens; [Hill]'s receipt of treatment at the Millcreek juvenile mental health facility due to severe depression, auditory hallucinations, and suicidal thoughts; and [Hill]'s potential for rehabilitation, to further his education, and to develop vocational skills. [Hill] himself testified in an unsworn statement that growing up was hard and that he struggled to survive; that he had "done things" just to be someone, just to have friends, and just to get clothes; that he had done these things to try to take the pressure off "them" (his parents); that he drank and smoke because he was depressed but that he tried to stop because those things only made him hurt more; that he had wanted to end his life; that he used to hear voices telling him to "go ahead" and kill himself; that he had tried

many times to end his life; that at school, he felt considerable pressure from not having the right clothes; that he had had problems especially with math; that when he went to Millcreek, he had told them all that he wanted help; that his mother's loss of the baby was bad, that she lived through bad circumstances, but that she had never left him and had always done the best she could to make sure they had what they needed; that although his father had not been around, they knew that they both loved each other; and that he was sorry the jury had to be there, sorry that the baby was gone, and sorry for the family.

Defense counsel's final mitigation witness was Dr. Schmidtgoessling. She testified that she had met with [Hill] initially on September 4, 1991, that subsequently a social worker had met with [Hill] three times, and that Dr. Schmidtgoessling had then met with [Hill] again on October 25, 26, and 28, 1991. Dr. Schmidtgoessling testified that their collective investigation revealed very much a struggling nuclear family, an extended family that was protective but struggling itself; a heavy exposure to drug trafficking and use, as well as to violence and intimidation; and a personal ([Hill]'s) and family history of psychological problems. She explained that [Hill]'s mother had had a number of serious psychological and emotional losses—stemming from her loss of two pregnancies and her difficult relationships with the fathers of her children—that [Hill]'s mother suffered severe depression from the time that [Hill] was fourteen-years-old; and that [Hill] had as a result many feelings of being overlooked and neglected, and of loss that his mother was not available to him. Dr. Schmidtgoessling further testified that [Hill]'s father was never active in [Hill]'s family, that [Hill] had grown up very much wanting a father, and that [Hill]'s self-worth was damaged by the absence of a relationship with his father. To that point, Dr. Schmidtgoessling also testified that the man to whom [Hill] was the closest—his maternal grandfather—died when [Hill] was fourteen, at which point [Hill] began experiencing problems, struggling in school, and increasing his substance abuse. By age seventeen, Dr. Schmidtgoessling testified, [Hill] was experiencing problems with serious depression. He was admitted to Millcreek, where records described how painful [Hill]'s family situation was for him and where another brother was also hospitalized with serious depression. Dr. Schmidtgoessling proceeded to testify that [Hill] had a large extended family of relatives who tried to look out for each other but who had problems of their own and were protective and less than forthcoming as a result. As Dr. Schmidtgoessling explained:

> . . . First off as a normal factor, it's not unusual that some people know [their] families better than others, so they have different perceptions of them.
>
> Our experience here is that some of the family have not been very open about sharing information. One family member would say this was a problem, the other would say no, it wasn't. So some of

> them, we believe, are simply being protective of each other, which is also typical for families. Families don't like to see their family members subjected to what they feel might be painful or humiliating circumstances.
>
> Sometimes families don't see what's going on because they're in denial, they can't or don't want to see at a psychological level not deliberately lying, don't know how to see problems because they don't know how to solve the problems. We believe that's also taking place in this family.

Dr. Schmidtgoessling went on to testify about [Hill]'s struggles in school, noting that they had not been able to pinpoint why [Hill] struggled as he did and remarking that psychologically, school is an important area where kids determine their self-worth and is important for developing the skills kids need to succeed later in life. Thus, Dr. Schmidtgoessling explained, [Hill]'s lack of success in school not only held him back in other areas of development but also made him more vulnerable to "street" influences as an alternative place for him to find his "niche." To that point, Dr. Schmidtgoessling testified about [Hill]'s heavy exposure, from a young age, to drug trafficking and drug use. She explained that, although they ascertained that [Hill] had begun using drugs and alcohol around age fourteen, they were not able to determine with certainty from their investigation the extent of [Hill]'s use of alcohol and drugs. The neighborhood where [Hill] was raised additionally exposed him to violence, to the point, Dr. Schmidtgoessling explained, that he became habituated to it. Further, according to Dr. Schmidtgoessling, [Hill] was exposed to violence in his own family, with [Hill]'s father having admitted to Dr. Schmidtgoessling that he had been physically abusive toward [Hill]'s mother. All this affected [Hill] as following, according to Dr. Schmidtgoessling:

> Basically it caused the defendant to become used to seeing violence. Additionally in his case he became—in an environment like that you're either a victim of violence or you become aligned with the people, like gangs, to protect himself. And in his case what he did is became more involved with people who were more violent so as to protect himself. We know he's been doing that since he's been approximately fourteen or fifteen years old, from what we've been able to put together.

The last area of testimony that Dr. Schmidtgoessling covered detailed [Hill]'s history of psychological treatment. Dr. Schmidtgoessling testified about [Hill] receiving treatment at Millcreek for one month during 1988. Records revealed, according to Dr. Schmidtgoessling, that [Hill] was suffering from major depression with psychotic features, that [Hill] reported hearing voices that told him to harm himself, that [Hill] was treated with antidepressant medication, after

which he improved after a month, was released, and was recommended for follow-up treatment at the Central Community Health Board. Dr. Schmidtgoessling was unable to confirm whether [Hill] actually availed himself of that after-care treatment. Dr. Schmidtgoessling reiterated that during the same time period, a brother of [Hill]'s also was hospitalized at University Hospital for depression. Dr. Schmidtgoessling proceeded to explain that [Hill], who was twenty years of age, was diagnostically young. Because younger people are "not considered to have a fully crystallized personality or fully set personality," according to Dr. Schmidtgoessling, "it's usually—late twenties is when you usually start applying diagnoses that you feel have reliability." That said, Dr. Schmidtgoessling emphasized that the depression from which [Hill] was suffering was not just "average" depression that everyone may experience; rather, it was much more severe, affecting [Hill]'s functioning in a significant fashion. Dr. Schmidtgoessling also testified that notwithstanding the foregoing, as well as the offenses of which [Hill] was convicted, she was of the view that [Hill] possessed the capacity to develop job skills, to better himself academically, and to benefit from individualized attention that prisons often offer in the way of vocational and educational programs.

In closing arguments, defense counsel emphasized why [Hill]'s youth was a mitigating factor; all the reasons that [Hill]'s family life and violent surroundings mitigated in favor of a sentence less than death; Dr. Schmidtgoessling's observations and conclusions; the many positive programs from which [Hill] could benefit in prison; and [Hill]'s sincerity in his unsworn statement.

*Hill*, 2013 WL 1345831, at *62–65. Based on this evidence, we cannot possibly conclude that trial counsel failed to investigate or present mitigating evidence, and "the presumption of reasonable performance is more difficult to overcome." *Beuke*, 537 F.3d at 643 (citing *Campbell*, 260 F.3d at 552. Accordingly, "we must closely evaluate whether [Hill's counsel] exhibited specific deficiencies that were unreasonable under prevailing professional standards." *Id.* (citing *Dickerson v. Bagley*, 453 F.3d 690, 701 (6th Cir. 2006)). Hill cites three alleged deficiencies: failure to present lay witnesses; failure to hire an independent mental health expert; and failure to hire a mitigation specialist.

(b) *Failure to Prepare Lay Witnesses*

As sub-part (3) of his IATC claim, Hill asserts that trial counsel was ineffective for failing to adequately prepare lay witnesses for their testimony at mitigation. But, as shown above, Hill's family members testified extensively at his trial and presented a full picture of his upbringing. Hill does not explain why counsel's actions were deficient, and he cites little

additional evidence that counsel should have elicited from witnesses. Hill's mother and three aunts each submitted affidavits containing the exact same paragraph:

> When asked about [Hill] and his childhood, I tried to focus on any positive memories that I had, and I did not understand that all of the difficulties of [Hill]'s upbringing should have been discussed as a potential basis for mitigating circumstances. I did not understand this because nobody ever talked to me about the type of information that is important to bring out in the mitigation phase of a death penalty trial.

R. 47, Affidavits of Mary E. Hill, Denise Hill, Jennifer Clark, and Ruby Hill, Page ID 5637–44. Despite the lack of evidentiary support, Hill suggests that counsel's failure to adequately prepare witnesses gave the jury "a severely misleading picture of Hill's life." Hill Br. at 68.

Hill's argument is unpersuasive and does not match the record. Hill's brief on appeal cites a number of facts and pieces of information that he alleges counsel should have discovered. He suggests the jury never heard about Hill's troubled relationship with his father or his mother's inability to fully care for him and provide the things he needed. Hill Br. at 64–65. He asserts that counsel failed to discover that he attempted suicide, that he abused drugs and alcohol, or that he heard voices telling him to kill himself. *Id.* But Hill's counsel did, in fact, present these facts during mitigation. While it is true that Hill's family presented varying, sometimes-conflicting accounts of Hill's life and upbringing, "that was *not* the result of deficient investigation and preparation on the part of defense counsel. Rather, it was the product of reality." *Hill*, 2013 WL 1345831, at *68. As Dr. Schmidtgoessling testified, family members are often protective or in denial regarding a family member's shortcomings, and may be unwilling to discuss them or to even believe that their loved one is capable of committing the crimes for which he was convicted. *See* Trial Tr. Vol. 12, Schmidtgoessling Testimony at 1713–14; *see, e.g.*, Trial Tr. Vol. 12, Mary Thompson Testimony at 1609–10. But that does not amount to ineffective assistance of trial counsel. What Hill truly argues, as the district court suggested, is that counsel was deficient for "failing to guide family members into uniformly emphasizing everything negative about [Hill]'s upbringing and uniformly omitting anything positive about [it.]" *Hill*, 2013 WL 1345831, at *68. We agree with the district court that this argument is not well taken.

With regard to the failure to adequately prepare witnesses, Hill cites only one piece of new information: that Hill was born as a result of his father raping his mother. Even if counsel's performance was deficient for failing to elicit this one fact from Hill's witnesses, Hill cannot show prejudice. "A petitioner does not establish prejudice if he shows only that his counsel failed to present 'cumulative' mitigation evidence, that is, evidence already presented to the jury." *Beuke*, 537 F.3d at 645 (quoting *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)). The jury heard about the realities of Hill's upbringing, including that Hill's father was abusive toward his mother and that that abuse made Hill accustomed to witnessing violence. While this particular fact is not entirely cumulative, "[it] is not powerful mitigating evidence" that, standing alone, "is reasonably likely to have changed the jury's recommendation of death." *Beuke*, 537 F.3d at 645. Accordingly, Hill cannot show that counsel's performance was deficient for failing to adequately prepare lay witnesses.

(c) *Failure to Hire an Independent Mental Health Specialist*

Hill asserts as sub-part (2) of his IATC claim that counsel was constitutionally ineffective for failing to hire an independent and competent mental health expert. Hill argues that Dr. Schmidtgoessling acted as an agent of the State and that she was wrong in her assessment of his mental health. Neither argument carries much weight.

Hill cites no authority to support the notion that he was entitled to a particular mental health expert. We have held that a capital defendant is entitled to a mental health expert during mitigation to assist in preparing an insanity defense, *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003). But even if Hill were entitled to an expert, "[t]he Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available." *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006) (citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

Hill received the assistance of an expert in Dr. Schmidtgoessling. The trial court granted Hill's "Motion to Employ Expert" to retain Dr. Schmidtgoessling, a clinical psychologist and the associate director of the Court Psychiatric Center, "to assist counsel in preparing for mitigation for sentencing purposes." R. 40, Entry Granting Motion, Page ID 3352. Hill asserts this is

irrelevant because Dr. Schmidtgoessling worked for the government and was not independent. But the record does not support his assertion, as the court found that Dr. Schmidtgoessling could "maintain a relationship of confidentiality [with Hill] until said privilege is waived by [Hill], subject to the Rules of Discovery." *Id.* Dr. Schmidtgoessling testified extensively in mitigation on Hill's behalf, and absent any evidence to support the idea that she did not maintain confidentiality or testify truthfully to support Hill's mitigation case, Hill's argument fails. *See Miller v. Colson*, 694 F.3d 691, 696 (6th Cir. 2012) ("In psychiatric assistance claims, 'independent' has become a term of art referring to a psychiatrist assigned exclusively to assist the accused in his defense.").

As for Hill's second argument, trial counsel was not constitutionally ineffective just because Hill disagrees with Dr. Schmidtgoessling's assessment. "A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren*, 440 F.3d at 772. And "[a]bsent a showing that trial counsel reasonably believed that [the expert] was somehow incompetent or that additional testing should have occurred, simply introducing the contrary opinion of another mental health expert during habeas review is not sufficient to demonstrate the ineffectiveness of trial counsel." *McGuire*, 738 F.3d at 758 (citing *Black v. Bell*, 664 F.3d 81, 104–05 (6th Cir. 2011)); *see Fautenberry v. Mitchell*, 515 F.3d 614, 625–26 (6th Cir. 2008) (concluding, in another case involving Dr. Schmidtgoessling, that in the absence of any evidence that Dr. Schmidtgoessling was incompetent, "any inadequacies in [her] expert assistance—assuming there were any—cannot be the basis for a meritorious ineffective-assistance claim").

Hill relies heavily on the affidavit of Dr. Gelbort, particularly his statement that "there was evidence of long-standing organic brain impairment, consistent with the fact that Hill had very high levels of lead in his blood during the first year of his life." Hill Br. at 65 (citing R. 262, Gelbort Aff., Page ID 6500–06. Nothing in Dr. Schmidtgoessling's testimony, on the other hand, suggested that Hill had organic brain impairment. Hill suggests that Dr. Schmidtgoessling incorrectly assessed his mental health, but whether Dr. Schmidtgoessling (at the time of mitigation) or Dr. Gelbort (almost a decade later) was correct is irrelevant. Dr. Schmidtgoessling met with Hill several times, began preparing for mitigation eleven weeks in advance, and

testified extensively on his behalf as a confidential expert. Without evidence that Dr. Schmidtgoessling was incompetent (or that trial counsel knew such a fact), Hill cannot show that trial counsel was deficient for relying on Dr. Schmidtgoessling.

(d) *Sub-Part (1): Failure to Hire a Mitigation Specialist and Investigate*

Finally, Hill argues that counsel was deficient for failing to hire a mitigation specialist and failing to conduct an adequate investigation of his background and mental health history. He cites a number of new facts that he claims counsel should have discovered, all from Dr. Gelbort's affidavit. As before, however, Hill cites no authority to suggest that counsel was constitutionally required to hire a mitigation specialist beyond Dr. Schmidtgoessling.[15] And the new facts that Hill contends are particularly relevant—that his father's friends sexually abused him, that his mother beat him regularly, and so on—came from Dr. Gelbort's conversations with Hill himself. Hill provides no explanation for *how* his trial counsel could have discovered these facts unless Hill had told him or Dr. Schmidtgoessling, and Hill never suggests that he told either of them. Because Hill has not provided any evidence to support his assertion that trial counsel should have discovered these things, counsel's performance was not deficient simply because Hill waited several years to reveal these facts to Dr. Gelbort.

**5. *Conclusion***

Hill must show a "substantial" claim of ineffective assistance of counsel to excuse the procedural default of his IATC claim, and he must actually demonstrate that counsel was constitutionally ineffective to prevail on the merits. He has not done so. "Because we find that trial counsel's performance was not deficient, we need not address whether [Hill] was prejudiced by that performance. [Hill] is not entitled to habeas relief for this claim." *Hodges*, 727 F.3d at 545. We therefore affirm the denial of relief on Hill's IATC claims.

---

**15** Hill cites the ABA Guidelines, but they do not establish a constitutional right to a mitigation specialist—in addition to a mental health expert—during the mitigation phase.

C.  **Eighteenth & Nineteenth Grounds:** Ineffective Assistance of Counsel—Direct Appeal

Hill next argues that he received ineffective assistance of counsel on direct appeal.  The district court denied the claim.  *Hill v. Mitchell*, 2013 WL 1345831, at *109.

To demonstrate ineffective assistance of appellate counsel, Hill must satisfy the same requirements prescribed in *Strickland* for ineffective assistance of trial counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).[16]  Hill asserts that his counsel on direct appeal was ineffective for: (1) failing to raise a *Brady* claim regarding the prosecution's suppression of evidence that Hill told probation officer Lynda Phillips that Domika's death was an accident; and (2) failing to raise various claims regarding the adequacy of Hill's trial counsel during the penalty phase.

**1.  *Failure to Raise Brady Claim***

During Hill's sentencing hearing, but after the jury recommended the death penalty, Phillips testified that Hill told her Domika's death was an accident.  App. R. 47, Hill App'x at A-431.  Phillips, a juvenile court probation officer, had approached her supervisor before the trial regarding this evidence, but her supervisor told her not to divulge the information.  R. 146-3, Phillips Aff., Page ID 486–87.  Hill himself had also forbidden Phillips from testifying because he believed it would make "no difference."  App. R. 47, Phillips Testimony, Hill App'x at A-432.  Hill's appellate counsel did not preserve a *Brady* claim regarding Phillips' statement on direct appeal.

Appellate counsel's failure to raise a *Brady* claim regarding Phillips' conversation with Hill was not ineffective assistance of counsel because Hill, not the prosecution, withheld the contents of the conversation.  Hill knew what he said to Phillips, and *Brady* "'only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial.'"  *Abdur'Rahman v. Colson*, 649 F.3d 468, 474 (6th Cir. 2011) (quoting *Apanovitch*, 466 F.3d at 474).  Hill's trial counsel was aware of the conversation—and Hill was obviously aware—so the

---

[16]The parties contest whether AEDPA applies, but the standard of review is ultimately immaterial because Hill's claims have no merit.

evidence was known to the defense and *Brady* was inapplicable.  *See Henness*, 644 F.3d at 325 ("[Petitioner] already knew of his own contact with the police at the time of trial, so the prosecution's failure to provide this information was not a *Brady* violation.").  Appellate counsel cannot be ineffective for failing to raise a meritless claim.

**2.** ***Failure to Raise Ineffective Assistance of Trial Counsel in Penalty Phase***

Hill argues his appellate counsel should have raised claims that trial counsel was ineffective for failing to (a) retain an independent mental health expert; (b) provide necessary records to Dr. Schmidtgoessling; (c) object to mitigation phase errors; and (d) request essential jury instructions, including an instruction regarding a "presumption of life."  His arguments are without merit.

*Failing to Retain an Independent Mental Health Expert.*  We have already rejected the merits of the underlying IATC claim for trial counsel's reliance on Dr. Schmidtgoessling.  Hill therefore cannot demonstrate prejudice based on appellate counsel's failure to raise the claim.

*Failing to Provide Records to the Court Psychologist.*  Hill argues that appellate counsel was ineffective for failing to raise an IATC claim regarding trial counsel's failure to provide certain records to Dr. Schmidtgoessling.  However, as the district court pointed out, and as Hill concedes, this claim "necessarily relies on evidence outside the trial record."  *Hill*, 2013 WL 1345831, at *100.  Under Ohio law, this claim was required to be brought on collateral review.  *State v. Cole*, 443 N.E.2d at 171.  Appellate counsel could not have brought this claim on direct appeal and did not perform deficiently by complying with Ohio law.

*Failing to Object to Mitigation Phase Errors.*  In his appellate brief, Hill simply argues that "[t]rial counsel's mitigation-phase representation was extremely weak."  Hill Br. at 86.  He does not point to any specific errors trial counsel should have objected to during mitigation, nor does he explain how appellate counsel was ineffective for failing to raise an IATC claim on that basis.  Hill is not entitled to relief on this undeveloped argument.

*Failure to Request Essential Jury Instructions.*  Hill's final ineffective-assistance argument is that appellate counsel should have raised an IATC claim because trial counsel failed

to request jury instructions regarding a "presumption of life," the merger of both counts of aggravated murder and the aggravated circumstances, the lack of unanimity needed to consider mitigating factors, and the additional sentences Hill would have received to "provide[] the jury with an accurate picture of the lengthy sentence Hill faced if a life verdict was returned." Hill Br. at 85–86.

But "[c]ounsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). The jury instructions stated that if the jury did not unanimously find, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating factors, it was *not* to recommend the death penalty. Trial Tr. Vol. XII, Jury Charge at 1783. This instruction is consistent with Ohio Revised Code § 2929.03(D)(2) and it is not unconstitutional. *See Buell v. Mitchell*, 274 F.3d 355–56 (6th Cir. 2001). Hill does not even attempt to argue that he was prejudiced by trial counsel's failure to request these jury instructions. He also does not argue that he would have prevailed on appeal if appellate counsel had made this argument. We therefore reject this argument.

### 3. *Conclusion*

Because Hill has not shown that appellate counsel's performance on direct appeal was deficient or that he was prejudiced by counsel's performance, we affirm the denial of Hill's ineffective-assistance-of-appellate-counsel claims.

### D. Twentieth Ground: Proportionality Review

Hill contends that the Ohio Court of Appeals and the Ohio Supreme Court failed to conduct meaningful proportionality review on direct appeal. He argues that the state courts did not consider "similar cases" because they only compared his case to cases where courts imposed the death penalty. However, the Ohio Supreme Court has held that Ohio's proportionality review "is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *Ohio v. Steffen*, 509 N.E.2d 383, 395 (Ohio 1987). Thus, the district court denied the claim. *Hill v. Mitchell*, 2013 WL 1345831, at *113.

We agree that the state courts did not unreasonably apply clearly established federal law here. The Constitution does not require a trial court to conduct proportionality review following the imposition of a death sentence. *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984). "Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison." *Williams v. Bagley*, 380 F.3d 932, 962 (6th Cir. 2004). We have therefore "held repeatedly that Ohio's system of proportionality review complies with the dictates of the due process clause," even when "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed." *Id.* 962–63 (citing seven prior Sixth Circuit cases that have upheld Ohio's limited proportionality review against constitutional challenges). Hill cites no authority to convince us to reconsider these decisions, and we therefore affirm the district court's decision to deny the claim.

### E. Twenty-Fourth Ground: Cumulative Error

Finally, Hill argues that the cumulative effect of the errors he alleges deprived him of his right to a fair trial and sentencing. Under AEDPA, we do not recognize claims of cumulative error. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011).

**V**

Our decision should not be viewed as condoning in any way law enforcement officials' suppression of information that may have been favorable to Hill's defense. To the contrary, we reiterate our disapproval of Hamilton County's consistent history of suppressing evidence.[17] But AEDPA requires habeas petitioners to bring their claims within its one-year limitations period. Hill did not bring the police report to the district court's attention for over three years, and he did not bring the grand jury testimony forward for almost two years. Hill's failure to comply with this congressionally mandated procedural bar resulted in "an insurmountable (and self-imposed) hurdle" to habeas relief. *Hill v. Mitchell*, 2012 WL 995280, at *14. Moreover, as explained above, even if we were to consider the merits of Hill's *Brady* claim, he would not be entitled to relief. Hill's claims on cross-appeal are also without merit. Accordingly, and for the foregoing

---

[17]*See, e.g.*, *Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014); *Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014); *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002).

reasons, we **REVERSE** the conditional grant of habeas relief on Claim 4(c). We **AFFIRM** the denial of habeas relief on the remaining grounds for relief, and **REMAND** to the district court for entry of an order denying the petition for writ of habeas corpus.

---

CONCURRENCE

---

ALICE M. BATCHELDER, Circuit Judge, concurring.  I join all but § III.D of the lead opinion.  Considering the totality of the evidence, I believe the withheld police report satisfies the standard for materiality of impeachment evidence under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *See Smith v. Cain*, 565 U.S. --, 132 S. Ct. 627, 630 (2012); *Kyles v. Whitley*, 514 U.S. 419, 450 (1995).  But it is clear that the claim is time barred.

In the lead opinion, Judge McKeague aptly explains that Hill discovered the withheld police report in December 2007, but did not assert this report as an amended *Brady* claim until March 2011, over three years later.  Although this assertion was beyond AEDPA's one-year limitation period, the district court held that the new claim related back to Claim 4(c) of Hill's original, timely filed petition.  In that petition, Hill had raised a three-part *Brady* claim:

> *Fourth Ground for Relief*: Prosecutors' failure to provide exculpatory evidence during pretrial discovery denied Genesis Hill a fair trial.
>
> a.  Withholding Linda Phillips's exculpatory evidence violated Mr. Hill's due process rights.
> b.  The State withheld mitigating polygraph evidence.
> c.  The files of the prosecutor and investigating officer contain *Brady* material.

*Hill v. Mitchell*, 2006 WL 2807017, \*40 (S.D. Ohio, Sept. 27, 2006) (record citation omitted).

> Originally, the district court had dismissed Claim 4(c):
>
> Regarding [Hill]'s blanket assertion in sub-part (c) that there must be more *Brady* information in the files of the prosecution and the investigating officer, given the history of the Hamilton County Prosecutor's Office of committing *Brady* violations, the [district] [c]ourt is not persuaded that there was sufficient evidence on the trial record from which [Hill] could have raised that argument on direct appeal.  But the utter lack of substance to the claim makes any procedural default analysis not only impossible, but also unnecessary.

*Id*. at *63; *see* Lead Op. § III.A. But the district court treated Hill's subsequent assertion that the withheld police report violated *Brady* as a motion to amend his original Claim 4(c), resurrected that claim, and held that this specific new assertion related back to the vague original claim.

Judge McKeague analyzed and distinguished the two predominant cases, *Mayle* and *Mandacina*, and concluded, succinctly and correctly, that Hill's amended *Brady* claim cannot be deemed to share a "common core of operative facts" with his original Claim 4(c), as required for relation back, because his original Claim 4(c) alleged no operative facts out of which the amended claim could be deemed to have arisen. Moreover, it is the very fact—that Hill could not have included in his original habeas petition a *Brady* claim based on the undiscovered police report—that entitled him, under AEDPA or Rule 60(b), to one year from the discovery of that newly discovered evidence to bring it to the district court's attention. *See* Lead Op. § III.C.

That is the key to this: relation back is unnecessary and inapplicable in the context of newly discovered evidence, for which the statute of limitations does not begin to run until the evidence is discovered. If a petitioner suspects a *Brady* violation but has no hard evidence to support that suspicion (or even begin to identify exactly what it might be), the proper approach is not to include a specious, all-encompassing *Brady*-based accusation in the original petition and then attempt to amend that petition in the event of some later discovery of evidence. The proper approach is to continue to demand discovery from the State and pursue it through other avenues (exactly as Hill's habeas counsel did here, in fact); then, upon finding such evidence, file the specific *Brady* claim within one year of obtaining it. AEDPA anticipated this: "The limitation period shall run from … the date on which the factual predicate of the claim … could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

Under Hill's limitless catch-all Claim 4(c), any and all withheld evidence would relate back. This approach not only circumvents the AEDPA statute of limitations, it does so by unacceptably circumventing the fundamental theory of the relation-back rule.

> [T]he relation back rule 'is intimately connected with the policy of the statute of limitations.' *See* Advisory Committee Notes to Fed. R. Civ. P. 15(c). It is designed to operate equally with that statute, to accommodate the statute of limitations policies that prevent stale claims from being litigated, and permit their

repose. Clearly the relation back rule was not designed to provide a means either to circumvent or to expand the limitations period.

*In re Allbrand Appliance & Television Co.*, 875 F.2d 1021, 1025 (2d Cir. 1989).

Elsewhere, courts considering this in the ineffective-assistance-of-counsel context have held that a petitioner does not satisfy the Rule 15 relation-back standard by raising a catch-all accusation of ineffective assistance in the original petition and then amending the petition later to assert a particular claim of attorney deficiency. *See United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005); *Davenport v. United States*, 217 F.3d 1341, 1346 (11th Cir. 2000); *United States v. Duffus,* 174 F.3d 333, 337 (3d Cir. 1999). This reasoning applies equally to *Brady* claims.

Finally, in a False Claims Act case, the D.C. Circuit offered this rather insightful and different analysis, emphasizing the plaintiff's failure to plead sufficiently at the outset.

> [The plaintiff]'s allegations … were nothing more than 'naked assertions' devoid of 'further factual enhancement,' the existence of a price-fixing 'club,' and that discovery would reveal other rigged contracts. Allowing such broad and vague allegations to expand the range of permissible amendments after the limitation period has run would circumvent the statutory requirement in the FCA that the amendments arise out of the conduct, transactions, or occurrences in the original complaint; it would also, we note, circumvent the recent teachings of *Iqbal* and *Twombly* by allowing amendments to relate back to allegations that were themselves nothing more than 'naked assertions.'

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 882 (D.C. Cir. 2010) (editorial marks, certain quotation marks, and citations omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Because Hill raised his new *Brady* claim well over two years too late and because there is no justification for its relation back to his original claim, it is now time barred and must be dismissed. Whether that claim might have had merit is immaterial. For these reasons, I join the lead opinion in reversing the judgment of the district court.

_____

**DISSENT**

_____

COLE, Chief Judge, dissenting. Today a grim game of "prosecutor may hide, defendant must seek" plays out in the federal courts. Genesis Hill was convicted of murder and sentenced to death in Hamilton County, Ohio. At nearly every chance since, in both state and federal post-conviction proceedings, Hill has maintained that the state withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). His claims proved prophetic: Sixteen years after Hill's conviction, a private investigator learned that the Cincinnati Police Department, through its infamous practice of creating "homicide books," *Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014), suppressed a report which pointed to a key prosecution witness as a suspect in the murder investigation. The district court granted a conditional writ of habeas corpus. But the majority reverses, concluding that the claim is time barred, since Hill failed to come forward with the long-suppressed report at his earliest convenience. Because the rule of *Brady* should encourage disclosure, not deception, I respectfully dissent.

I.

In *Brady*, the Supreme Court held that the suppression of evidence that is favorable to the accused and material to his guilt or punishment denies due process of law. 373 U.S. at 87. "Society wins," the Court explained, "not only when the guilty are convicted but when criminal trials are fair." *Id.* For more than a half century, that rule of fundamental fairness has allowed "the search for truth" to prevail in our criminal justice system. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999).

Hill's claim centers on two documents that emerged during federal habeas proceedings: (1) Officer Givens's Preliminary Investigation Report and (2) Teresa Dudley's Grand Jury Testimony. Considering the "cumulative effect" of that suppressed evidence, *see Kyles v. Whitley*, 514 U.S. 419, 421 (1995), I am convinced that Hill was deprived of his right to a fair trial, and has satisfied the procedural prerequisites to obtaining relief in federal court. But first, a few words on the standard of review and procedural default.

A.

As the Supreme Court has made clear, federal habeas review is "sharply limited by established principles of deference." *Cone v. Bell*, 556 U.S. 449, 476 (2009) (Roberts, C.J., concurring in judgment). To obtain relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Hill would ordinarily need to show, for instance, that the state court's "adjudication" of his claim "involved an unreasonable application" of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). So unreasonable in fact that the error was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington v. Richter*, 562 U.S. 86, 103 (2011).

I remain cognizant of AEDPA's limitations in that regard. *See, e.g.*, *Woods v. Etherton*, 136 S. Ct. 1149 (2016) (per curiam); *White v. Wheeler*, 136 S. Ct. 456 (2015) (per curiam); *Rapelje v. Blackston*, 136 S. Ct. 388 (2015) (Scalia, J., dissenting from denial of certiorari); *White v. Woodall*, 134 S. Ct. 1697 (2014).

But this case, the majority appears willing to concede, arises in a different posture. *Ante*, at 7. Section 2254(d), by its terms, can only apply to claims that have been "adjudicated on the merits in State court proceedings." *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). And the Ohio courts did no such thing here. *See State v. Hill*, No. C-961052, 1997 WL 727587, at *1 (Ohio Ct. App. Nov. 21, 1997) (concluding, instead, that Hill's *Brady* claim was "barred by *res judicata*" because it "could have been brought on direct appeal"). Federal habeas review is thus freed from the "deferential standard that applies under AEDPA," and the merits of Hill's *Brady* claim may be "reviewed *de novo*." *See Cone*, 556 U.S. at 472.

With that conclusion comes an attendant limitation. On direct appeal, federal courts have no authority to review decisions that "rest on adequate and independent state grounds." *Herb v. Pitcairn*, 324 U.S. 117, 125 (1945). So too on collateral review: claims that have not been raised in compliance with state procedural rules are barred in federal court. *Wainwright v. Sykes*, 433 U.S. 72, 86–87 (1977); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991) (noting that "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical

requirements for exhaustion" because "there are no state remedies any longer 'available' to him" under 28 U.S.C. § 2254(b)(1)).

Hill's claim is, by all accounts, procedurally defaulted. The Ohio Court of Appeals concluded, in 1997, that Hill's claims were "barred by *res judicata.*" *Hill*, 1997 WL 727587, at *1. The state has consistently argued, since at least June 1999, that Hill's *Brady* claims are procedurally defaulted under Ohio law. And the district court reached the same conclusion, on the state's motion, back in September 2006. *Hill v. Mitchell*, No. 1:98-CV-452, 2006 WL 2807017, at *61–66 (S.D. Ohio Sept. 27, 2006). Hill's *Brady* claim is accordingly barred "absent a showing of cause and actual prejudice." *See Engle v. Isaac*, 456 U.S. 107, 129 (1982). As the Supreme Court has recognized, however, the cause-and-prejudice standard dovetails with the elements of a meritorious *Brady* claim. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler*, 527 U.S. at 282. So I consider those issues in tandem.

B.

This case thus presents a simple question: Did the state violate the rule of *Brady*? It is beyond debate that Officer Givens's preliminary investigation report and Teresa Dudley's grand jury testimony were suppressed by the state, and that those documents were favorable to Hill. I would also conclude that this evidence qualifies as "material" for *Brady* purposes.

The relevant standard has crystalized in recent years: "Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam) (internal quotation marks omitted). A defendant need not show that he "more likely than not" would have been acquitted; only that the suppressed evidence could reasonably be taken to "undermine confidence" in the verdict. *Id.* (internal quotation marks omitted). And, by that measure, a defendant can prevail "even if . . . the undisclosed information may not have affected the jury's verdict." *Id.* at 1006 n.6.

The Court has consistently recognized the value of evidence bearing on the credibility of a key prosecution witness. *See, e.g., id.* at 1006; *Smith v. Cain*, 132 S. Ct. 627, 630 (2012); *Dretke*, 540 U.S. at 700–01; *Strickler*, 527 U.S. at 293–94; *United States v. Agurs*, 427 U.S. 97, 112 n.21 (1976); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *Napue v. Illinois*,

360 U.S. 264, 269 (1959). In *Giglio*, for example, the Court held that the failure to disclose a promise of immunity made to the government's "key witness" was prejudicial because the case "depended almost entirely" on his testimony. 405 U.S. at 151, 154. Similarly, in *Dretke*, the Court ruled that the state's concealment of evidence discrediting "two essential prosecution witnesses" amounted to prejudice because their testimony was the "centerpiece" of the prosecution's case. 540 U.S. at 675, 701. And just this term, in *Wearry*, the Court concluded that suppressed evidence undermining the credibility of the prosecution's "star witness" was material because the case resembled a "house of cards" built upon his account of the crime. 136 S. Ct. at 1003, 1006.

This case is of a piece with *Giglio* and its progeny. To appreciate why, consider the facts of Hill's trial, paying close attention to Teresa Dudley's role as a prosecution witness and the state's reliance on her testimony to build its case:

Domika Dudley, the six-month-old daughter of Genesis Hill and Teresa Dudley, resided with her mother's side of the family in Cincinnati, Ohio. The teenage parents lived just down the street from each other and, despite some quarrels, appeared to have an ongoing relationship. But on May 31, 1991, just past midnight, Dudley awoke to find her daughter missing. Officer Givens, who was the first investigator to arrive on the scene, combed the neighborhood that night to no avail. The next morning, however, Dudley found one of Domika's barrettes on the garage floor of the Hill-family home. And the next day, after re-focusing their investigation accordingly, police discovered Domika's lifeless body in a wooded lot nearby. The infant's skull had been fractured. She was wrapped up in a shirt, several plastic trash bags, and electrical tape, and then placed in an empty formula carton. *State v. Hill*, 661 N.E.2d 1068, 1072–74 (Ohio 1996).

The Hamilton County Prosecutor's Office charged Hill with aggravated murder and sought the death penalty. *See* Ohio Rev. Code §§ 2903.01(B), 2929.04(A)(7). The state's theory of the case hinged on Hill and Dudley's supposedly tumultuous relationship: according to the prosecution, Hill broke into Dudley's home while she slept, kidnapped Domika undetected, murdered her, and then disposed of the body, all in a grievous attempt to avoid "pay[ing] any child support." (Trial Tr., Vol. VII, p. 956.) But there was no smoking gun—say, a confession,

or matching blood and hair samples—linking Hill to the actual killing.  Rather, to demonstrate that Hill had motive to kill, access to Domika, and the implements needed to dispose of the body, the state pieced together an assortment of, as the majority puts it, "largely circumstantial" evidence. *Ante*, at 31.

The most powerful testimony on that score came from Teresa Dudley, who was (in the prosecution's words) an "essential witness." (*Id.*, Vol. VIII, p. 1019.)  Dudley began by testifying that she had recently "got into it" with Hill over child support. (*Id.* at 1003.)  When confronted about making those payments, Hill apparently "started going off," said "I bet I don't pay," and threw a brick at Dudley's window. (*Id.* at 1004–05.)  The prosecution then asked Dudley to identify various pieces of physical evidence, directly linking Hill to the crime.  Take, for example, the clothing wrapped around Domika's body.  Dudley was certain that this was Hill's shirt because she "kn[ew] him long enough to know his wardrobe." (*Id.* at 1026.)  The prosecution also asked her to identify Domika's barrette.  Dudley testified that she found the distinctive clasp (it was "blue" with a "pink teddy bear" on it) "[j]ust sitting there" inside Hill's garage. (*Id.* at 1013–14.)  The barrette caught her eye because she "did [Domika's] hair earlier" that evening. (*Id.* at 1013.)  The prosecution concluded by asking Dudley to identify a picture of Domika's body, ostensibly in effort to "show[] the barrettes and . . . the shirt she identified." (*Id.* at 1020.)  But Dudley broke down at this sight, "became hysterical," and started "crying very loudly." (*Id.* at 1017–18.)  The jury was then removed from the courtroom.  Defense counsel moved for a mistrial, but the judge determined that the outburst "was [not] anything particularly out of the ordinary." (*Id.* at 1019.)

Hill's defense began—and ended—with an attempt to undermine Dudley's credibility. As the Ohio Supreme Court recognized, defense counsel's strategy was to suggest that Dudley had in fact committed the crime, and Hill was the perfect patsy. *See Hill*, 661 N.E.2d at 1074 ("At trial, numerous . . . [d]efense witnesses suggested . . . that Teresa was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill's kitchen; and that she may have 'planted' the barrette on the garage floor.").

But on cross-examination, Hill's attorney was wary of further "upset[ting]" Dudley in front of the jury. (*Id.* at 1025.)  And more debilitating still, the defense lacked any means to

seriously undermine Dudley's account. As the proceeding ran its course, it became clear that Hill's attorney could accomplish little beyond quibbling over minor factual details, poking insubstantial holes in the timeline, and casting aspersions on Dudley's maternal fitness. The prosecution even boasted, in its closing argument, that the defense's effort to "pin it on someone else" and "plant [a] seed of doubt in [the jurors'] minds" was rather feeble. (*Id.*, Vol. XI, p. 1471.) Instead, the state successfully cast Dudley as Hill's antithesis, contrasting the father's "remorse[less]" expression with "[t]he way [the mother] reacted at the pictures of the baby." (*Id.* at 1542–43.) And in the end, the jury accepted Dudley's version of these events, convicted Hill of aggravated murder, and sentenced him to death.

No wonder the district court ruled as it did. Given this context, the court thought that the impact of the suppressed evidence on Dudley's credibility "would have crippled the prosecution's case against [Hill]." *Hill v. Mitchell*, No. 1:98-CV-452, 2012 WL 995280, at *10 (S.D. Ohio Mar. 23, 2012). I unequivocally agree. Dudley's testimony was the thread that kept the prosecution's case from coming apart at the seams, *see Wearry*, 136 S. Ct. at 1006, and she provided the "*only* evidence" directly tying Hill to the murder, *see Smith*, 132 S. Ct. at 630.

Query, as the prosecution did during closing arguments, "[w]hat [were] the things that tie[d] the defendant into this case?" (*Id.* at 1543–44.) At one point, for example, the prosecution picked up the shirt that was found wrapped around Domika's body and "thr[e]w the exhibit[] [at] the defendant." (*Id.* at 1544.) This piece of clothing was significant, the state explained to the jurors, because Dudley "identified . . . [it] as being [Hill's] shirt." (*Id.*) The prosecution also reminded the jury that the "little barrette [was] a big deal"—only a mother would "remember what the . . . barrette[] looked like," the state surmised, "especially if this was [her] only child" and she had "just put [it] in [the] little baby's hair five or six hours earlier." (*Id.* at 1543; *id.*, Vol. X, at 1269–70). The relevant question, it seems, is "*who* tied the defendant to this case?" And the state, for good reason then, described Teresa Dudley as its "essential witness." (*Id.*, Vol. VIII, p. 1019.)

True, Officer Givens's report and Dudley's grand jury testimony do not exonerate Hill outright. But speculation of that sort is irrelevant: one establishes *Brady* materiality, not through the "possibility of an acquittal," but by "showing that the favorable evidence could reasonably be

taken to put *the whole case* in such a different light as to *undermine confidence in the verdict.*" *Kyles*, 514 U.S. at 435 (emphasis added). A defendant can prevail on a *Brady* claim, that is, "even if . . . the undisclosed information may not have affected the jury's verdict." *Wearry*, 136 S. Ct. at 1006 n.6.

These suppressed documents are material because they build up Hill's defense, provide a compelling means to undermine the state's most powerful witness, and thus call into question the reliability of the jury's verdict. Here, the preliminary investigation report, in no roundabout way, suggests that Dudley was a potential suspect in the state's murder investigation. According to the report, Officer Givens thought that he could "solve[]" the crime by "[i]nvestigat[ing] why [Dudley] ran from the police" and directed them to search "behind the house (several times)." (Givens Report, R. 219-4, PageID 2298–99.) And the grand jury testimony shows that the discovery of Domika's barrette, a critical event, was uncertain in Dudley's mind: she told the grand jury she found a specific barrette *outside* Hill's garage, but later told the jury at trial that she found a different barrette *inside* Hill's garage. (*Compare* Dudley Grand Jury Test., R. 237-1, PageID 2598, *with* Trial Tr., Vol VIII, p. 1013–14.)

Would anything have changed if Dudley was thoroughly impeached in that regard? Maybe, maybe not. But whatever the ultimate evidentiary significance of those facts, the suppressed evidence is surely enough to undermine confidence in the outcome of *this* trial. *See Kyles*, 514 U.S. at 435 n.8 ("[N]one of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone."). For the jury was otherwise rudderless—no reason to disbelieve Dudley's testimony, no reason to discount the weight of the remaining circumstantial evidence, and no reason to doubt that Hill kidnapped and murdered Domika. In fact, Hill's trial attorney testified that, but for the state's nondisclosure, he "would have conducted further investigation," "questioned the state's witnesses about these matters," and could have presented a "much more effective[] defen[se]." (Krumbein Aff., R. 215-12, PageID 2237.)

What is more, the state's remaining circumstantial evidence is not "strong enough to sustain confidence" in the capital verdict. *See Smith*, 132 S. Ct. at 630. The state touted various eyewitnesses at trial: for example, Barbara Sue Janson, a neighbor, testified that she saw Hill

enter Dudley's home about 10 minutes before Domika's disappearance.  But that is all she saw. Janson knew nothing of what happened inside the Dudley residence, nor did she see Hill depart. Janson further claimed that she could "positive[ly]" identify Hill's shirt, and that she once overheard him say "he'd kill that little bitch before" paying child support.  (Trial Tr., Vol. 8, p. 981–82.)  But it later came out that Janson had "bad blood" with the Hill family, that she only believed the shirt wrapped around Domika's body "look[ed] like" one Hill owned, and that Hill never "threaten[ed] little Domika or ever [said] he would hurt her." (*Id.* at 988, 989, 1004.)  The state also marshalled the testimony of a local bus driver named Patrick Ormond, who apparently overheard a young man on his bus say that "he thought he might get the chair" for "what he had done to a little baby." (*Id.*, Vol. IX, p. 1138.)  But despite that vivid recollection, Ormond could not identify Hill in the courtroom.

The prosecution also called several police officers and forensic experts to introduce circumstantial physical evidence.  For instance, the prosecution established that Hill's latent fingerprint was on a lightbulb at Dudley's home, and that Hill's uncle was missing some electrical tape.  The state also matched serial numbers from the formula box in which Domika's body was found, with formula cans found inside the Hill-family home.  And a forensic expert for the state opined, based on an unusual "wood grain" and "jigsaw" pattern analysis, that one of the trash bags in which Domika's body was wrapped came from a roll inside the Hill household. (*Id.*, Vol. IX, p. 1160, 1165.)  But that evidence was not unassailable.  For example, Hill admitted that he went to Dudley's house that night, but explained that he only "turned out the [light] bulb" as a "signal" he was "call[ing]" on her, then simply left when she did not respond. (*Id.*, Vol. X, p. 1413.)  And the electrical tape, formula box, and trash bags were readily accessible to others, which "suggests, at most, that someone in [Hill's family or] group of friends may have committed the crime, and that [Hill] may have been involved in events related to the murder *after* it occurred." *See Wearry*, 136 S. Ct. at 1006.  Hardly an open-and-shut capital case.

All in all, I would conclude that the suppressed evidence is sufficient to undermine confidence in the jury's verdict, and that Hill has simultaneously established cause and prejudice to excuse his procedural default.  Because the appropriate remedy is a new trial, I would not reach Hill's remaining claims on cross-appeal.

II.

The majority also takes issue with the timing of Hill's amended petition. AEDPA imposes a stringent one-year limitations period on federal habeas applications. 28 U.S.C. § 2244(d)(1). But the Federal Rules of Civil Procedure create "an exception to that rule," *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011), for amended habeas petitions that "assert[] a claim or defense that arose out of the conduct, transaction, or occurrence set out—*or attempted to be set out*—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B) (emphasis added).

The issue, at this crossroads, is whether Hill's amended habeas petition "relates back" to his original petition, or whether his *Brady* claim is time barred. The majority opts for the latter course, *ante*, at 7, concluding that the district court abused its discretion in applying the relation-back doctrine. *See Coe v. Bell*, 161 F.3d 320, 341 (6th Cir. 1998). I cannot agree. Respectfully, the majority's ruling is based on a mistaken reading of the Supreme Court's decision in *Mayle v. Felix*, 545 U.S. 644 (2005), and directly conflicts with the Eighth Circuit's well-reasoned opinion in *Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003).

The law is clear. In *Mayle*, the Supreme Court held that Rule 15 only allows relation back when "the original and amended petitions state claims that are tied to a common core of operative facts"; not "simply because they relate to the same trial, conviction, or sentence as a timely filed claim." 545 U.S. at 662, 664. To further clarify, the Court offered *Mandacina* as an ideal application of the relation-back doctrine in habeas proceedings. *Id.* at 664 n.7; *see also Cowan*, 645 F.3d at 819. There, Mandacina's timely original petition "contained *only generalized assertions* that evidence obtained by the Gladstone Police Department was withheld," while his untimely amended petition—"filed three years later," as it happens—related to the suppression of a particular report favorable to his defense. *Mandacina*, 328 F.3d at 999, 1000 (emphasis added). That degree of specificity was sufficient to satisfy the rationale of Rule 15, the court reasoned, because "a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Id.* at 1000; *see also Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984) (per curiam). And the Supreme Court endorsed that view: "Both pleadings related to

evidence obtained at the same time *by the same police department*," so relation back was appropriate in the *Brady* context. *Mayle*, 545 U.S. at 664 n.7 (emphasis added).

If this fact pattern feels familiar, that is because it describes Hill's case to a T. Hill's first-in-time petition generally alleged that "[t]he files of the prosecutor and investigating officer" likely contain "more *Brady* material that it is refusing or unable to produce," while his second-in-time petition set forth the precise details of later-uncovered evidence. (*Compare* Second Am. Petition, R. 137-1, PageID 115, *with* Hill Am. Mot. for Recons., R. 219, PageID 2274–82.) Both petitions (pre- and post-amendment) concerned the same "congeries of facts supporting the grounds for relief," *i.e.*, the pre-trial suppression of evidence by the Hamilton County Prosecutor's Office. *See Mayle*, 545 U.S. at 661. To be precise, Hill's defense counsel sought pre-trial discovery of "all information obtained during the course of [the] investigation," and the Hamilton County Prosecutor's Office replied that "[t]he State of Ohio knows of no evidence favorable to the defendant." (Hill App., Vol. 1, p. A-1, A-7.) The district court rightly concluded, following *Mayle* and *Mandacina*, that Hill's *Brady* claim as set forth in his motion to amend shared a common "core of operative facts" with his original petition, relation back to the date of the original petition was appropriate, and AEDPA's statute of limitations did not bar his claim. *Hill*, 2012 WL 995280, at *13.

Yet the majority sees things differently. Depicting his *Brady* claim as "sweeping" and "vague," the majority asserts that Hill's original habeas petition was "completely bereft of specific fact allegations or evidentiary support and was not tied to any particular theory of relief." *Ante*, at 7, 14–15. Not at all. Hill supported his *Brady* claim with factual allegations— from the state's "already apparent" suppression of Teresa Dudley's polygraph examination, to Hamilton County's lack of "training in identifying material exculpatory evidence," to the state's "extensive history of *Brady* violations" in the Southern District of Ohio, to the state's continued refusal to allow inspection of the prosecutor's and investigating officer's files. (Second Am. Petition, R. 137-1, PageID 114–16.) Hamilton County's previous *Brady* violations are well documented. *See Jamison v. Collins*, 291 F.3d 380, 383 (6th Cir. 2002) (recognizing the Cincinnati Police Department's "practice of 'homicide booking'" and describing how

investigators would gather only "inculpatory material into a homicide book that was then sent to the prosecutors"); Brief for Former Federal Judges and Prosecutors as *Amici Curiae* 5–8.

The majority's anxiety is, in some sense, understandable. I too am wary of the "profound societal costs that attend the exercise of habeas jurisdiction," *Smith v. Murray*, 477 U.S. 527, 539 (1986), and recognize that Congress enacted AEDPA's statute of limitations to "encourag[e] finality," *Rhines v. Weber*, 544 U.S. 269, 276 (2005). Even so, a petitioner's "[d]elay by itself is not sufficient reason to deny a motion to amend," *Coe*, 161 F.3d at 341−42 (internal quotation marks omitted), particularly in the *Brady* context, where claims "turn[] on the *cumulative effect of all such evidence* suppressed by the government," *see Kyles*, 514 U.S. at 421 (emphasis added); *see also Mayle*, 545 U.S. at 672 & n.6 (Souter, J., dissenting) (noting that *Brady* claims "like a great many others will call for examining the trial record as a whole for signs of requisite prejudice or reversible error").

The majority takes issue with Hill's "failure to present the police report for over three years *after he discovered it*," *ante*, at 16, but overlooks the cumulative nature of *Brady* claims and does not acknowledge that discovery was ongoing in this case. In September 2007, for instance, the district court sanctioned limited discovery on Hill's claim that the prosecution sought the death penalty on the basis of his race. *See McCleskey v. Kemp*, 481 U.S. 279 (1987). True, in December 2007, Hill obtained Officer Givens's report through a request for information under Ohio's Public Records Act. *See* Ohio Rev. Code § 149.43(B)(1). Due to the vagaries of litigation, however, the proceeding was stayed for about a year, and further delayed when the Federal Public Defender's Office came on as lead counsel. And it was not until in September 2010 that the district court finally compelled the state to disclose all documents contained in the "prosecutor's file." *Hill v. Mitchell*, No. 1:98-CV-452, 2010 WL 3894202, at *10 (S.D. Ohio Sept. 30, 2010). For three years, then, the state managed to avoid production. But as soon as discovery was complete, and Hill felt that the cumulative effect of all *Brady* evidence could be fleshed out, he moved for reconsideration.

The majority's true concern, it seems, is that any given prisoner could include a "catch-all *Brady* claim" in his original habeas petition and, if suppressed evidence "eventually turns up," then wait "five, ten, or even twenty years to present" it to the district court. *Ante*, at 16. One

struggles to imagine a scenario where this parade of horribles would come to pass. (Prisoners routinely assert, and courts routinely dismiss, foolhardy *Brady* claims. But why would a prisoner sit on an *actionable* claim for 20 years?) Nevertheless, the majority's reasoning goes so far afield as to give new meaning to the words "conduct, transaction, or occurrence" in Rule 15: a *Brady* claim must now set forth, "specifically, [what] the State was suppressing and how it would have benefitted [the petitioner] at trial had it been disclosed," in order for the relation-back doctrine to *ever* apply. *Ante*, at 15. And that is the case even though, at the time of filing, a habeas petitioner will have limited access to the state's records, and favorable evidence will often remain hidden from sight. This cannot be the balance the Supreme Court meant to strike, in *Mayle*, when it held that Rule 15 "relaxes, but does not obliterate, the statute of limitations." 545 U.S. at 659.

The majority ultimately concedes that Hamilton County's "consistent history of suppressing evidence" gave Hill a "colorable basis" to assert his *Brady* claim; that the state is in no position to "invoke equitable principles"; and that Hill could not have spelled out the minutia of his *Brady* claim "based on the undiscovered police report or grand jury testimony in his original habeas petition." *Ante*, at 16, 53. For all that, the majority merely expresses "disapproval" of the state's decades-long deception, and disclaims the idea that it is "condoning the State's actions in suppressing evidence favorable to Genesis Hill." *Ante*, at 53. I fear the opposite is true. The willingness of federal judges to turn a "blind eye," will likewise incentivize "prosecutors to avert their gaze from exculpatory evidence, secure in the belief that, if it turns up after the defendant has been convicted, judges will dismiss the *Brady* violations as immaterial," or worse, on procedural grounds. *See United States v. Olsen*, 737 F.3d 625, 633 (9th Cir. 2013) (Kozinski, J., dissenting from denial of rehearing en banc).

\* \* \*

Because the state's "dishonest conduct" and "unwarranted concealment should attract no judicial approbation," *see Dretke*, 540 U.S. at 696, I respectfully dissent.